**Bermudian Springs School District**

766

*John W. Phillips,* for appellant.
*James F. Wildeman, James L. Crawford, Anthony J. Molloy, Forest N. Myers,* and *Roger M. Simon, Assistant Attorney General,* for Pennsylvania Labor Relations Board.

MacPHAIL, *P. J.,* March 5, 1975—This matter is before us on an appeal by the Bermudian Springs School District from a final decision of the Pennsylvania Labor Relations Board. The proceeding was initiated by a request for clarification filed by the Bermudian Springs Education Association to clarify the certified bargaining unit for the employes of the Bermudian Springs School District. In particular, the letter requested a clarification regarding the classifications of "department heads," "head coaches," and "athletic director." The association further requested the board to define the statement, "supervisors over any personnel" as that term related to the Public Employe Relations Act of July 23, 1970, P.L. 563 (No. 195), 43 PS §§1101.101, et seq. The position of department head was created after the bargaining unit was certified. The position of head coach was included in the bargaining unit and the school district now seeks to have head coaches excluded. The position of athletic director was placed in the contract proposal of the PSEA in the 1972-73 school year. The school board refuses to negotiate that position.

The certification of Bermudian Springs Education Association, as the exclusive representative of the employes of Bermudian Springs School District, defined the bargaining unit as follows:

"In a subdivision of the employer unit comprised of professional employes: instruction, guidance, nurse services and librarian, and excluding all non-professional employes, supervisors over any personnel, first level supervisors, and confidential employes as defined in the Act."

After hearings, as prescribed by the Public Employe Relations Act, supra, the Pennsylvania Labor Relations Board held that the bargaining unit was comprised of professional employes: instruction, guidance, nurse services, librarian, department heads, head coaches, and athletic director, and excluding all non-professional employes, supervisors, first level supervisors and confidential employes as defined in the act. (Conclusion no. 4 of nisi order clarifying certified unit.) The school district argued before the board and argues on this appeal that department heads, head coaches and the athletic director in the district are supervisors and/or first-level supervisors as that term is defined in Act 195.

Section 604 of Act 195 states that the P.L.R.B. shall determine the appropriateness of a unit. It further states that in determining the appropriateness of the unit, the board shall not permit employes at the first level of supervision to be included with any other units of public employes, but shall permit them to form their own separate homogeneous units. Subsection 19 of section 301 defines "first level of supervision" as the lowest level at which an employe functions as a supervisor. Subsection 6 of section 301 of the act defines "supervisor" as any individual having authority in the interests of the employer to hire, transfer, sus-

pend, lay off, recall, promote, discharge, assign, reward or discipline other employes or responsibly to direct them or adjust their grievances; "or to a substantial degree effectively recommend such action, if in connection with the foregoing, the exercise of such authority is not merely routine or clerical in nature but calls for the use of independent judgment." Subsection 5 of section 604 provides that the board in determining supervisory status may take into consideration the extent to which supervisory functions are performed.

Within this framework we are called upon to determine whether the evidence in support of the board's decision is substantial and legally credible and whether the board's conclusions are unreasonable, arbitrary or illegal: P.L.R.B. v. Butz, 411 Pa. 360, 192 A. 2d 707 (1963). Where the adjudication is not in accordance with law, we should not affirm: Act of June 4, 1945, P.L. 1388, sec. 44, 71 PS §1710.44. That consideration is paramount here because the issues raised were resolved by the board's interpretation of sections 301 and 604 of the Public Employe Relations Act. While we must give due consideration to the board's interpretation of the statute, it is our function to determine whether that interpretation effectuates the intention of the General Assembly as we ascertain the object of the General Assembly in enacting the legislation: Act of November 25, 1970, P.L. 707, as amended, 1 Pa. C.S.A. §1921.

Attached to the testimony taken before the board are numerous exhibits including a job description for the department heads in the district, a position description for head coaches and a position description for the athletic director. Basically, department heads are responsible to coordinate the development of courses of study within their respective departments, but they are also required to partici-

pate in the interviewing of candidates for teaching positions and to make recommendations to the principal. When requested to do so by the principal, they are required to observe the members of their department while they are teaching and to report their observations to the principal to be used in the "rating and improvement of the teaching staff." They are responsible for securing and organizing budget requests within their departments. They are paid $250 per school year as additional compensation.

According to the position description for them, head coaches are to assist the athletic director and principal with the recommendations for hiring, re-hiring, transferring, promoting, demoting, supervising and firing of assistant coaches. They are required to direct, supervise and evaluate the performance of all assistant coaches and to assist the principal and athletic director at the first level of adjustment of all grievances for assistant coaches. They are also responsible for preparing a yearly budget for the sport's program in which each is involved. They receive additional compensation by means of supplemental contracts.

According to his position description, the athletic director is required to assist the principal and superintendent with recommendations for the hiring, rehiring, transferring, promoting, demoting, supervising and firing of coaches, to assist the principal at the first level of adjustment with all grievances involving coaching personnel and to prepare the athletic budget in cooperation with the head coaches and the high school principal.

In its findings of fact, the board concluded from the evidence that the department heads, head coaches and athletic director are in fact teachers and are primarily hired for that purpose. The board also found from the evidence that in fact the princi-

pal does the actual rating of the teachers (subject to review by the superintendent), the actual interviewing of teachers and the actual assignment of teachers. The board also found that the principal of the high school is responsible for the school's athletic program, that in actual fact the head coaches usually do not rate their assistants and that the principal rather than the athletic director has the last word with respect to the firing and disciplining of coaches. In short, the board found that notwithstanding the authority vested in the employes by virtue of job or position descriptions, in actual fact they do none of the things which would place them in the category of supervisor or first-line supervisor under the Public Employe Relations Act.

Furthermore, with respect to the athletic director, the board found that the position classification was not adopted until April 10, 1973, and since the hearing was held June 20, 1973, there hadn't been any opportunity to see what the athletic director would do with respect to the performance of his functions.

From these findings, the board concluded that none of the persons holding the job classifications in issue were supervisors or first-level supervisors as those terms are defined in the statute. All parties involved in the issue before us, including the P.L.R.B. have concluded that there is no appellate authority in Pennsylvania interpreting or construing the statutory definitions of "supervisor" and "first level supervisor." Section 301(6) of the act is almost identical with its federal counterpart. In the Labor-Management Relations Act of 1947, Act of June 23, 1947, 61 Stat. 137, 29 USC §152, the term "supervisor" is defined as meaning "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other

employes, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action, if in connection with the foregoing the exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment." We regard it as significant that the Pennsylvania legislature used almost the identical language of the federal statute, *except* that it added the words "to a substantial degree" before the words "effectively recommend." The P.L.R.B., in its adjudication in the case now before us, relies upon two adjudications of the N.L.R.B., a previous adjudication of the P.L.R.B. and the decision of the Lancaster County Court of Common Pleas in P.L.R.B. v. Lancaster County Commissioners, 3 Pa. P.E.R. 208 (a case decided in 1973 and recorded in Lancaster County in Trust Book 42 at page 336). Those authorities are cited as supportive of the P.L.R.B.'s holding here that "effective recommendation" means "controlling" recommendation.

We will note first of all that none of the cases, including the Lancaster County case, construe the precise language used in the Pennsylvania statute (section 301(6)) ". . . or to a *substantial degree* effectively recommend such action. . . ." (emphasis ours). Thus, in the Lancaster County opinion, the court said (at p. 4): "To find that an individual has the power to effectively recommend, it is necessary that his recommendation be given controlling weight." Again we emphasize that there is nothing in that holding which interprets or construes the precise language of section 301(6) of Act 195, supra. The Lancaster County Court (and the P.L.R.B. in the adjudication we now have for review) cites Risdon Manufacturing Co., 195 N.L.R.B. 579 (1972), as authority for the proposition that to be an "effective" recommendation, a recommendation must be "controlling." In the Ris-

don case the N.L.R.B. had to determine whether line foremen and group leaders were "supervisors." One of the factors considered by the board in determining that persons with those job classifications were not supervisors was that recommendations they made to their foremen were not accepted without independent investigation by the foremen. However, other factors noted by the board in reaching its decision were that these people generally worked the same hours as their fellow employes, they had no authority to hire, suspend, lay off, discharge or discipline employes, that they had no independent responsibility for the quantity or quality of work performed and that their special responsibility was to maintain the flow of work. The board concluded that on the basis of the "entire record," line foremen and group leaders were conduits for foremen rather than supervisors.

However, in Oregon Teamsters Security Plan Office, 119 N.L.R.B. 207 (1957), where the issue was whether a discharged employe was an employe protected by the provisions of the Labor-Management Relations Act of 1947, or a supervisor as defined in the act, the board did hold that in order to find whether an employe had the power of "effective recommendation" the board would have to be convinced that the employe's recommendations had "controlling weight."

In North Hills School District, PERA-R-757-W 1972, the P.L.R.B. in a final order reversed its position in a nisi order of certification and, citing Risdon Manufacturing Company, supra, and Oregon Teamsters Security Plan Office, supra, held that "the power of effective recommendation" means that the recommendation has "controlling weight, and is acted upon without independent investigation by the person to whom the recommendation is made." Again we must emphasize the total ab-

sence of any reference to the precise language in section 301(6)—"to a substantial degree effectively recommend such action."

Our conclusion from reading all of the cases cited in the matter now before us is that an "effective recommendation" means one that must be accepted as distinguished from a mere suggestion or an unsolicited comment. However, when the legislature qualified "effective recommendation" in section 301(6) to mean a recommendation that is effective "to a substantial degree," then it seems to us that such a recommendation need *not* have "controlling weight" and that such a recommendation need not be accepted necessarily, although it would receive careful consideration. We conclude that the board in the present case used an incorrect standard to determine whether the department heads, coaches and athletic director were supervisors.

As we previously noted, the board *may* in determining supervisory status, take into consideration the extent to which supervisory and non-supervisory functions are *performed*. However, as we have already observed, the board found that the position classification for the athletic director was not adopted until April 10, 1973, which was a little more than two months prior to the hearing before the board. Nevertheless, the board simply included the athletic director in the bargaining unit, although admitting by implication that there had really been insufficient time to ascertain the extent to which supervisory and non-supervisory functions were performed. In the same frame of reference, it must be noted that department heads were not appointed until the beginning of the school year 1972-73 and that the job description for head coach was not adopted until April 10, 1973. It would certainly seem that if the board is going to base its

conclusions, as it has done here, on whether or not supervisory functions are "performed," then it should have more than the two months' experience upon which to base its findings. There is some question in our mind as to whether or not even one year would be sufficient for such a finding. In N.L.R.B. v. Metropolitan Life Insurance Company, 405 F. 2d 1169 (1968), the court held that since the criteria for supervisory powers are set forth in the statute in the disjunctive, the *possession* of such a power is sufficient to cause the possessor to be classified as a supervisor *even if the power is not customarily exercised.* While we can find no language in the federal statute similar to that found in section 604(5) of the Pennsylvania act, it does seem that the possession of supervisory power should prevail over the function test at least where there has been an insufficient period of time to determine whether or not the functions authorized are in fact performed.

In construing the intention of the General Assembly when it enacts legislation, one of the matters we may consider is the objective to be obtained by the statute: Act of 1970, supra, 1 Pa.C.S.A. §1921(4). Therefore, we may legitimately inquire why employes of supervisory status were excluded by the legislature from the bargaining units of other employes. This question was answered very recently by the United States Supreme Court in Beasley v. Food Fair, 416 U.S. 653, 94 S. Ct. 2023, 40 L.Ed 2d 443 (1974). The Supreme Court observed that supervisors were originally excluded from employe bargaining units so that they could not be caught up in the bind of serving two "masters." The court said that if supervisors were members of and active in the union which represented the employes they supervised, it would be possible for the supervisors to obtain and retain positions of power over their fellow union members while working on the

job. Perhaps, in simple language, this simply means that to an employe, a "boss" is a boss if he, the employe, must take orders or instructions from him. We can think of no other appropriate test to determine whether or not a person is a "first line supervisor." From the supervisor's standpoint, the question may well be whether the employe is compelled to take orders from him. Using the master-servant relationship as an analogy and carrying out the decision of the United States Supreme Court in the Beasley case, supra, a determination of supervisory capacity may well hinge upon the question of whether the loyalty of the person involved is to the employer in carrying out management policy or to a fellow employe who simply follows orders like he (the supervisor) does; and is thus merely a "conduit."

We now reach the ultimate question of an appropriate order where we have found that the board's adjudication is not in accord with the law as we understand it. If we remand for further consideration by the board, we necessarily delay the time for appellate consideration of the important issues raised in this case. On the other hand, if we set aside the board's adjudication, we deprive the board of the opportunity to review the evidence and to take additional testimony if that is necessary in order to determine after a sufficient expiration of time whether the department heads, head coaches and athletic director in the Bermudian Springs School District possess and/or perform *any* supervisory functions, including the authority to effectively recommend *to a substantial degree* any of the acts enumerated in section 301(6) *in the interests of the employer*. While it is highly desirable to have immediate appellate review, we do not think it would be fair to the board to set aside its adjudication on the present record.

## ORDER

And now, March 5, 1975, the within matter is remanded to the Pennsylvania Labor Relations Board for further consideration of its findings and conclusions in the light of the foregoing opinion.