Pennsylvania Labor Relations Board, Appellant,
*v.* Butz.

Argued January 16, 1963. Before Bell, C. J., Mus-
manno, Jones, Cohen, Eagen, O'Brien and Roberts,
JJ.

*James F. Wildeman,* Assistant Attorney General,
with him *Paul F. Mower,* Special Counsel, *Raymond
Kleiman,* Assistant Attorney General, and *David Stahl,*
Attorney General, for Pennsylvania Labor Relations
Board, appellant.

*Kenneth F. Lee,* with him *George S. Black,* and
*Black and Davison,* for appellees.

Opinion by Mr. Justice Benjamin R. Jones, July
2, 1963:

On November 10, 1961, the Pennsylvania Labor Relations Board (State Board) held a hearing on a petition filed with it by Retail Clerks Union, Local 1436 (Union) requesting a secret ballot to determine whether the Union should be the exclusive bargaining agent for an employee unit composed of the installation and service personnel of Modern Home Appliance Co. (Employer) of Chambersburg, Pa. The State Board granted the petition, conducted the election and a majority of the employees, (i.e., those employees recognized by the Board as eligible to be members of the bargaining unit) voted in favor of representation by the Union. Subsequently, the State Board entered a nisi order certifying the Union as the exclusive representative of the unit and this order was made final on January 28, 1962.

The Employer made timely appeal to the Court of Common Pleas of Franklin County (court).[1] The court ordered, inter alia, that "all decisions and orders of the Pennsylvania Labor Relations Board, or the enforcement thereof, heretofore made in this matter [be] stayed" pending hearing of the appeal.

During the pendency of that appeal, the Union filed with the State Board a complaint of discrimination and refusal to bargain collectively against the Employer. The State Board ordered a hearing on this complaint and the Employer then sought and obtained from the court a rule to show cause why a writ of prohibition should not issue prohibiting the State Board from entertaining the complaint.

The court heard argument both on issuance of the writ of prohibition and on the merits of the appeal and handed down two orders; the first order confirmed the issuance of the writ of prohibition and the second order

---

[1] As provided in Section 9(b) of the Act of June 1, 1937, P. L. 1168, 43 PS §211.9, commonly called the Pennsylvania Labor Relations Act (Act).

set aside the State Board's order of certification. From each order, the State Board now appeals.

## The Writ of Prohibition

The issuance of a writ of prohibition is not within the powers of a court of common pleas of this Commonwealth.

This Court reviewed the historical background of the writ of prohibition in *Carpentertown Coal & Coke Co. v. Laird,* 360 Pa. 94, 61 A. 2d 426, noting that it was an extremely ancient writ which issued originally out of King's Bench but later out of Chancery, Exchequer and Common Pleas, that is, out of the High Courts of Westminster. Section XIII of the Act of May 22, 1722, 1 Sm. P. L. 131, establishing a Supreme Court and "County Courts of Common Pleas" for Pennsylvania, invested the Supreme Court with all the powers of the Justices of King's Bench, Common Pleas and Exchequer "at Westminster". Section XXI of that Act gave the courts of common pleas general original jurisdiction within their counties but *omitted* any reference to the powers of the High Court Justices at Westminster.

Alone of English judicial tribunals, the High Courts of Westminster had the power to issue the great prerogative writs of prohibition, certiorari, mandamus and quo warranto. These writs, unlike other writs, were not mere formal judicial tools but rather weapons wielded by the judicial arm of the Crown to curb ecclesiastical and baronial encroachments [2] and, as such, they were, as a matter of policy, used but sparingly and only when no other remedy savoring less of monarchial arbitrariness was available.

Later Constitutions and statutes of Pennsylvania since 1722 have made the prerogative writs available to our courts of common pleas with the exception of pro-

---

[2] See: Pollock and Maitland, History of English Law before Edward I.

hibition. The only court of this Commonwealth, other than this Court, authorized to issue the writ of prohibition is the Superior Court but even that Court can issue the writ only to the extent that an action in prohibition is ancillary to proceedings within that Court's appellate jurisdiction: Act of May 21, 1941, P. L. 47, 17 PS §181.

While it has been held that the Act of 1836, June 16, P. L. 784, 17 P.S. §281, conferred upon the courts of common pleas the powers of the English Court of Chancery (*Kneedler v. Lane,* 3 Grant Cas. 465), it is equally true that in Pennsylvania *no* court has the full powers of the English Chancellor and such equitable jurisdiction as exists in this Commonwealth is confined to the enumerated powers in equity to be found in the Act of 1836 and succeeding statutes: *Alpern v. Coe,* 352 Pa. 208, 42 A. 2d 542, 161 A.L.R. 1046. Our research fails to disclose any authority for the issuance of the writ of prohibition under the chancery powers of common pleas courts.

By its nature, the writ controls the distribution and allocation of judicial jurisdiction among the various constitutional and statutory judicial tribunals. To hold that a court of common pleas has a common law power to issue the writ would lead in logic to the absurd result that such a court could challenge the jurisdiction of this Court to hear an appeal taken from common pleas. Precisely that absurdity was attained in England when the four High Courts used the writ against each other in their undignified scrambles for jurisdiction, culminating in Lord Chief Justice Coke's temerarious and disruptive use of the writ in his impassioned defence of the common law courts in the reign of James I. Bearing this history of the writ in mind, it is implausible to surmise that the withholding of the power to issue the writ of prohibition from inferior tribunals in this Commonwealth was the result of any legislative oversight.

The court below relied on the authority of *Alberts v. Bradley,* 11 Pa. D. & C. 2d 107, 111, *Carpentertown Coal & Coke Co. v. Laird,* supra, and *First Congressional District Election,* 295 Pa. 1, 13, 144 A. 735.

In *First Congressional District Election,* the writ issued from this Court to prohibit certain actions of a common pleas judge sitting in a quasi-judicial capacity as a computer of election tallies: under the circumstances, anything said on the subject of common pleas powers to issue prohibition would have been obiter and, in any event, the case stands for no more than the proposition that the writ does issue from this Court to a quasi-judicial tribunal. In *Carpentertown,* the very power of *this* Court to issue the writ was challenged. In *Alberts* there is dicta squarely in point based on the authority of *Carpentertown.* A careful reading of *Carpentertown* convinces us that the court in *Alberts* erred in equating the powers of *our* courts of common pleas with those of their more formidable namesake in England.

In Pennsylvania, courts of common pleas lack the authority to issue a writ of prohibition and, in issuing such writ in the case at bar, the court below erred.

### The Merits of the Appeal

The State Board and the Employer are in substantial agreement that the questions at issue are (a) whether the State Board had jurisdiction; (b) whether the State Board's determination of the appropriate bargaining unit was unreasonable, arbitrary or illegal.

The State Board, in its brief, recognizes that *Guss v. Utah Labor Relations Board,* 353 U. S. 1, 77 S. Ct. 598, and its companion cases, *Amalgamated Meat Cutters and Butcher Workmen of America, etc. v. Fairlawn Meats, Inc.,* 353 U. S. 20, 77 S. Ct. 604 and *San Diego Building Trades Council v. Garmon,* 353 U. S. 26, 77 S. Ct. 607, abolished "the theory of concurrent jurisdiction and the practice of State Courts and Boards

'taking' jurisdiction in areas where the National Board refused to act because of budgetary considerations or otherwise." [3]

The Labor Management Reporting and Disclosure Act of 1959, infra, commonly called the Landrum Griffin Act, then attempted to remedy the situation thus created, i.e., where the National Board declined to act and the State Board lacked jurisdiction to act, by providing that: "(1) the [National] Board, in its discretion, may, *by rule of decision or by published rules* adopted pursuant to the Administrative Procedure Act, decline to assert jurisdiction over any labor dispute involving any class or category of employers, where, in the opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial to warrant the exercise of its jurisdiction: *Provided,* That the Board shall not decline to assert jurisdiction over any labor dispute over which it would assert jurisdiction under the standards prevailing upon August 1, 1959.

"(2) Nothing in this Act shall be deemed to prevent or bar any agency or the courts of any State . . . from assuming and asserting jurisdiction over labor disputes over which the Board declines, pursuant to paragraph (1) of this subsection, to assert jurisdiction." : Act of Congress of September 14, 1959, P. L. 86-

---

[3] These three cases were decided on the rationale that, in enacting the National Management Labor Relations Act (29 U.S.C.A. §141 et seq.), Congress meant to reach the full extent of its power under the commerce clause of the U. S. Constitution and that the proviso to Section 10(a), U.S.C.A. §160(a) implied exclusive jurisdiction over the field of labor relations in the National Labor Board. In making these decisions, the Supreme Court was aware that there would be created "a vast no-man's land, subject to regulation by no agency or court" in the labor field and that it was not material that Congress had made it impossible for the National Board to exercise the jurisdiction so granted by withholding the necessary funds for implementation of its powers.

257, Title VII, §701(a), 73 Stat. 541 (29 U.S.C.A. §164(c)(2)). (Emphasis supplied)

The State Board contends that the effect of that Act is to withdraw federal preemption and to permit state boards and courts to exercise their jurisdiction over an employer whose business affects interstate commerce when the National Board, by rule of decision or by published rules, declines to assert jurisdiction and that, viewed in the light of standards set forth by the National Board in previous decisions where it had declined to act, the National Board would decline jurisdiction in the case at bar. Howbeit, in the case at bar the State Board did not make any determination whether the Employer's "nonretail" operations of its business were such as to bring into play the standards of the National Board said to be applicable, but simply stated that it was obvious from the record that this Employer's wholesale business was not really "nonretail" business at all and, in any event, the Employer did only a "minimal" amount of "nonretail" business.

As a practical matter, however, the State Board did not rest its assertion of jurisdiction upon this line of argument. Upon receipt of a letter from the Regional Director (Director) of the National Board in Pittsburgh, the State Board "found it unnecessary to make a determination as to the nonretail status of this Employer" and then proceeded to assume and assert jurisdiction upon the basis of this letter as well as a letter from the Director to the Employer. The Director's letter to the State Board advised that the petition filed by the Union with the National Board in this same matter "was withdrawn because as a result of investigation it appeared that it would not effectuate the purpose of our [National] Act to exercise jurisdiction therein." The Director's letter to the Employer advised that this petition had been withdrawn "with my approval".

On this posture of the record, we must determine initially whether the letters of the Director are evidence of a "rule of decision" declining jurisdiction within the meaning of the provisions of *Landrum-Griffin*, supra.

Fortunately, since we interpret a federal statute, we may look behind the printed word of the statute to ascertain, if possible, the Congressional intent where we find, as here, that the language of the statute is not crystal clear (*Phelps-Dodge Corporation v. NLRB*, 313 U. S. 177, 61 S. Ct. 845), and especially where the statute contains matters of great national moment imposing upon us the duty of so interpreting the statute as best to effectuate the policies of the act: Ibid.

The *Landrum-Griffin Act* was not reported upon by a committee of the House or Senate but was introduced (late in the session) and passed without change in the House and survived the House-Senate conference with but slight changes. However, the quoted provisions did receive attention in the conference. Where the Senate Bill stipulated that the National Board could decline jurisdiction by "rule or otherwise", the *Landrum-Griffin* wording calling for such a determination "by rule of decision or by published rules" prevailed. On the other hand, the proviso to subsection (1), supra, limiting the National Board's power of declination to pre-1959 standards, was inserted as a result of the conference.

Mr. Griffin's introduction of the bill in the House provides—since there was almost no floor debate prior to its passage in the House—the only authoritative statement of the intent underlying the sections we now construe.[4] He stated: "It should be noted that both the Committee [N.R. 8342] and the [prior Senate bill]

---

[4] Legislative History of the Labor-Management Reporting and Disclosure Act of 1959, p. 1522(2) (U.S. Government Printing Office 1959).

ignore the fact that, until the *Guss* decision was handed down, state boards and state courts could, and did, accept jurisdiction over cases which the National Board declined to handle. The substitute bill [the Landrum-Griffin] would eliminate the no-man's land by restoring the situation substantially to what it was before the preemption doctrine was carried to the point reflected in the Guss and Fairlawn decisions. In rejecting the totally federal approach of the committee bill, and the 'slightly less federal' approach of the Senate bill, this bill in Section 701(a) [5] would ratify the authority of the Federal Board to decline jurisdiction over cases where the effect on commerce is insubstantial. It would permit the Board to do this either by rule of decision or by published rules. Subsection (2) would then vest State boards and State Courts . . . with authority to exercise jurisdiction over such classes of cases as the Board has declined or would decline."

As this quotation indicates, Congressional debate on the "no-man's land" issue centered on whether the National Board would be compelled to take all cases within its potential jurisdiction or whether the pre-*Guss* situation would be restored and no member of the Congress was heard to advocate the continued existence of the "no-man's land." The statute clearly reveals the intent of the Congress: the "no-man's land" was to be eliminated by granting to the National Board the authority to decline jurisdiction and, in such event, authorizing the state agencies to assert their jurisdiction. In effect, the impact of *Guss* was nullified.

How then is such declination of jurisdiction by the National Board to be evidenced? When we note that the House-Senate conference rejected the statutory wording "by rule or otherwise", it is obvious that the Congress imported that a declination of jurisdiction

[5] Subsections (1), (2), supra.

would be attended by some formality and that the Congress rejected statutory wording which would have authorized an informal declination. On the other hand, we cannot assume that those who sought to escape from "no-man's land" could do so only at the expense of protracted procedure or litigation but we must assume that the Congress meant precisely what it said when it left the question of the declination of jurisdiction to the National Board's pre-1959 standard-guided discretion and that such formal procedures as might be authorized under the federal act, or regulations made pursuant thereto, would suffice as a "rule of decision" or "published rules" declining jurisdiction.

In the case at bar, did the Director's letter to the State Board constitute a declination of jurisdiction by the National Board by "rule of decision" within the statutory purview?[6] The letter to the State Board is brief and that to the Employer more so.[7] The letter to the State Board states that the petition filed by the Union with the Director in this same labor matter was withdrawn because, *after investigation,* it appeared that it would not effectuate the purpose of the national act to exercise the National Board's jurisdiction while the letter to the Employer states that this petition was withdrawn with the *approval* of the Director. On the surface, it might appear that the Employer is correct in contending that these letters simply mean that the Union had *withdrawn* its petition and that such action

---

[6] It is of no moment that the decision of the Director was communicated in the form of a letter; it is sufficient that it was a communication in writing. Since neither the statute, nor the regulations thereunder, prescribe any formalities for the communication of the decision of declination, we forbear to invent one.

[7] Our research reveals that the language employed is probably a formula used by all Directors. See: *Hirsch v. McCullough,* 303 F. 2d 208, for virtually the same wording in the letters therein quoted.

of *withdrawal* did not equate a declination of jurisdiction by the National Board such as would authorize the State Board to assert its jurisdiction. However, the letters must be interpreted in the light of the national act and the regulations enacted pursuant thereto and viewed in such light it becomes evident that the *withdrawal* of a representation petition is not a perfunctory act but the result of deliberate and considered action by those acting for the National Board in passing upon the right to withdraw such petition.[8]

---

[8] A representation petition filed under the national act is a formal proceeding made upon the basis of sworn information (29 U.S.C.A. App. §102.60). On receipt of such a petition the regional office of the National Board conducts an investigation which checks the justifiability of further action by the National Board (29 U.S. C.A. App. §101.17). If, for any reason, the investigation convinces the Director that further action is not warranted, the petitioner is invited to withdraw the petition or his petition will be dismissed. If the petition is dismissed, the petitioner—but apparently no other party—may appeal to the National Board within 10 days (29 U.S.C.A. App. §§101.18, 102.71). Prior to a hearing directed by the Director, Section 102.60 (29 U.S.C.A. App. §102.60) states that "the petition may be withdrawn only with the consent of the regional director" and, after the close of a hearing, the consent of the National Board to a withdrawal is required, further emphasizing the essentially euphemistic character of the word "withdraw" as used by the Director in the case at bar. The section numbers of 29 U.S.C.A. Appendix correspond with those of the NLRB Rules and Regulations, Series 8, in effect at the time the Director's letters were written.

It must also be noted that the Employer, if it really was "in doubt" as to the tribunal having jurisdiction, could have, once this matter was before the State Board, petitioned the National Board for an advisory opinion "on whether it would assert jurisdiction on the basis of its current standards": Section 102.98 et seq. (29 U.S.C.A. App. §102.98 et seq.). Had the Employer done so, the Director's approval of the withdrawal of this petition could have been tested administratively. Until the Employer so acted and the National Board's advisory opinion given to the contrary, the determination of the Director is the final determination of the National Board's jurisdiction.

In the letter of the Director to the State Board, the Director specifically assigns the reason for the withdrawal of the Union's petition, i.e., that the policies of the national act—which the Director was bound to administer—would not be effectuated by the exercise of jurisdiction by the National Board. The language of the letter is subject to no other interpretation than that jurisdiction was declined for a fundamental, rather than an administrative, reason and that the subject matter of the petition did not sufficiently affect interstate commerce as to warrant the exercise of jurisdiction by the National Board. In our view, this letter, together with the letter indicating that the Director had *consented* to the withdrawal, constituted a sufficient declination of jurisdiction by the National Board to justify the State Board in assuming and asserting jurisdiction over the matter under the provisions of *Landrum-Griffin,* supra.

The contention of the Employer that, assuming the regulations of the National Board empower the Director to consent to the withdrawal of a representation petition, such regulations are *ultra vires* being an unauthorized delegation of the powers and functions of the National Board is without merit. Section 701 (b) of *Landrum-Griffin,* supra,[9] authorizes the National Board to delegate to its regional directors its powers in representation proceedings, the avowed purpose of such authorization being to enable the National Board to more effectively exercise its jurisdiction by freeing it from having to determine every preliminary matter. Though the power to decline jurisdiction is not specifically mentioned, it is implicit in the powers delegated as even a cursory examination of the powers specifically delegated under Section 9 indicate.[10]

---

[9] 29 U.S.C.A. §153 (b).

[10] 29 U.S.C.A. §159 (b), (e).

Furthermore, the Employer's contention that an *ex parte* declination of jurisdiction constitutes a violation of due process is meritless. The regulations of the National Board [11] provide elaborate procedures whereby the Employer may test the views of a Director as to jurisdiction by petitioning the National Board for an opinion as to whether the National Board would assert jurisdiction on the basis of its current standards.

The Employer has submitted authorities from other states which hold that a full dress opinion by the National Board, after hearing, can constitute a declination of jurisdiction within the meaning of *Landrum-Griffin;* with such authorities our instant determination is not inconsistent. In the case at bar, the decisional point is that, in a representation proceeding, the Director has all the powers of the National Board and his consent to a withdrawal of a representation petition upon the basis of the stated reason that the exercise of jurisdiction by the National Board would not effectuate the policies of the national act constitutes a sufficient declination of jurisdiction to permit the State Board to assume jurisdiction.

The court below held that the Director's letters did not constitute a declination of jurisdiction because the National Board itself, rather than a Director, must make such determination. With that holding we do not agree. The National Board, with statutory authority, properly delegated to the Director its authority to decline jurisdiction and, the Director having made a final determination in accordance with proper procedure, the federal jurisdiction over the instant labor matter was suspended. If the Congress had intended that any further formalities attend a declination to act by the National Board it would have said so. Not having said so, the State Board is not put on

[11] 29 U.S.C.A. App. 102.98 to 102.104; 29 C.F.R. §102.98 to §102.104.

enquiry when it receives notice of declination in fact from an officer of the National Board who has apparent authority to act for that Board and who did in fact approve the withdrawal of the petition presented to the National Board. It is difficult to imagine how much more evidence of declination to act the State should require before assuming jurisdiction over the labor dispute thus abandoned. Under the circumstances, the State Board very properly assumed and asserted jurisdiction in this matter.

The Employer also contends that, in determining the composition of the bargaining unit, the State Board acted unreasonably, arbitrarily or illegally in excluding certain employees from the unit and that such exclusion was not supported by legally credible evidence. The Employer argues that the conclusions of the State Board, if they are supportable at all, must be solely founded on the testimony of the one employee who testified for the Union and that, of the 70 questions asked of this witness on direct examination, 30 questions were leading questions and, hence, the testimony of that witness was legally incredible.

Section 7(b), of the Pennsylvania Labor Relations Act, supra, (43 PS §211.7) provides, inter alia: "the board shall decide in each case whether . . . the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof. . . ." In this respect, our Act and the National Act are practically identical and under both Acts the determination of an appropriate unit' for collective bargaining is one for the expert judgment of the labor board.[12]

After referring to Section 7(b) of the Pennsylvania Labor Relations Act, the court below correctly stated: "It is not the duty of a court on review to substitute

---

[12] *Duquesne Light Company Case*, 345 Pa. 458, 29 A. 2d 18; *Packard Motor Car Co. v. NLRB*, 330 U.S. 485; *NLRB v. Atkins &*

its judgment concerning what is the appropriate bargaining unit for that of the Board, but only to determine whether the evidence in support of the Board's decision is substantial and legally credible, and whether the Board's conclusions are unreasonable, arbitrary or illegal [citing cases]."

A reviewing court is always hesitant to upset the factual findings of a jury or even of a judge sitting without a jury because of the difficulty of ascertaining from the bare words of the record the nuances that might well overturn any credit that might be given to the spoken word. Such is particularly true in the review of findings of administrative tribunals, where the law has entrusted the ascertainment of the facts to persons presumably selected for their experience and expertise who are, as Justice (now Chief Justice) BELL pointed out in *Delaware County National Bank v. Campbell,* 378 Pa. 311, 328, 106 A. 2d 416, better qualified than any court to make a factual finding on a subject within their field. In the labor field, particularly in small concerns, it is a very difficult task to determine which of the employees are in need of the protection of collective bargaining and which of them have attained a position which would indicate that forcing them into a bargaining unit would be detrimental rather than beneficial to the success of the bargaining process. In the instant case, the State Board had to determine which of the employees were primarily salesmen and which were primarily service and installation personnel, though the evidence tended to show that all the employees had some sales, service and installation functions. To employ a sociological term, the Board had to determine the "pecking" order and to discover the "pecked" rather than the "peckers". In substitut-

---

*Co.,* 331 U.S. 398; *NLRB v. Hearst Publications, Inc.,* 322 U.S. 111; *PLRB v. Henry,* 361 Pa. 565, 64 A. 2d 764; *Chapin v. PLRB,* 356 Pa. 577, 52 A. 2d 568.

ing its own version of the facts for those of the State Board, the court below exceeded its reviewing function and, in so doing, erred.

The Employer contends that there was no evidence to support the conclusions and findings of the Board in that the testimony produced by the Union was a nullity since it was, allegedly, elicited by means of leading questions put to the one witness who testified for the Union. That being so, argues the Employer, the State Board was bound by the testimony produced by the Employer, there being no "legally credible" evidence to contradict it.

Aside from the fact that no test is set forth for the quality of the evidence at a representation hearing under Section 7(b), supra, of the Pennsylvania Labor Relations Act, unlike the injunction that judicial rules of evidence be followed in an unfair labor practice hearing under Section 8(b) (43 PS §211.8) of the Act, we are of the view that the argument of the Employer is not supported by the record. While evidence elicited by means of leading questions is a form of hearsay it does not follow that words "put in the witness' mouth" are *necessarily* untrue. The record reveals that 30 of the 70 questions put to the witness by the Union's business agent were leading, yet both the hearing examiner and the Employer's counsel subsequent to the allegedly improper questions questioned this witness on the subject matter elicited by the leading questions and such questions did not affect the substance of the direct evidence. We cannot state, upon this record, that the Union's testimony was not legally credible. If credible, such testimony was more than a "mere scintilla" and of sufficient substance to support the conclusion of the State Board.[13]

---

[13] See: *Universal Camera Corporation v. NLRB*, 340 U.S. 474, 71 S. Ct. 456.

There was evidence, therefore, on which the State Board could have made the determination that it did; in such a case, this Court has said, time and again, that it will not lightly substitute its judgment for that of a body selected for its expertise whose experience and expertise make it better qualified than a court of law to weigh facts within its field. The court below should not have attempted to substitute its judgment for that of the State Board as to the composition of the appropriate bargaining unit.

Orders of the court below are reversed. Costs on Employer.