Norwin School District, Petitioner v. Commonwealth of Pennsylvania, Unemployment Compensation Board of Review, Respondent.

68

Argued November 14, 1983, before Judges WIL-LIAMS, JR., CRAIG and BLATT, sitting as a panel of three.

*Michael I. Levin,* with him *William Fearen, Cleckner and Fearen,* for petitioner.

*Ronald N. Watzman,* for respondents, Joseph Belan et al.

*Michael D. Alsher,* Associate Counsel, with him *Charles Hasson,* Associate Counsel, and *Richard L. Cole, Jr.,* Chief Counsel, for respondent, Unemployment Compensation Board of Review.

OPINION BY JUDGE CRAIG, January 31, 1984:

Norwin School District appeals from an order of the Unemployment Compensation Board of Review granting benefits to full-time and substitute teachers represented by the Norwin Education Association (union). The board concluded that the claimants' unemployment was the result of a lockout by the school district, within the meaning of §402(d) of the Unemployment Compensation Law,[1] rather than a strike by the teachers.

We have carefully reviewed the record and conclude that there is substantial evidence[2] to support the board's findings, as summarized below.

The union and the school district entered into a collective bargaining agreement, effective September 1, 1978 through August 31, 1981, under which the school board agreed to provide certain Blue Cross and Blue Shield coverage to all eligible employees. The agreement further provided:

It is agreed that if another carrier can provide and guarantee equivalent benefits as stipulated in the present policies in effect on the signing

---

[1] Act of December 5, 1936, Second Ex. Sess., P.L. (1937) 2897, *as amended,* 43 P.S. §802(d), which provides in part:

An employee shall be ineligible for compensation for any week—

. . . .

(d) In which his unemployment is due to a stoppage of work, which exists because of a labor dispute (other than a lockout) at the factory, establishment or other premises at which he is or was last employed. . . .

[2] *H. & A.. Sales Co. v. Unemployment Compensation Board of Review,* 63 Pa. Commonwealth Ct. 304, 437 A.2d 1296 (1981).

date of this agreement, the board may change carriers.

In April, 1981, the school board resolved to replace the existing Blue Cross/Blue Shield coverage with the self-insured Alpha Health Care Plan which became effective July 1, 1981. The union filed a grievance with regard to the substitution of health plans, alleging that Alpha was not the equivalent of the Blue Cross/Blue Shield plan. On August 24, 1981, an arbitrator sustained the grievance and ordered the school board to reinstate immediately the previous Blue Cross/Blue Shield plan. The school board appealed the arbitrator's decision to common pleas court.

Negotiations concerning a new collective bargaining agreement began in January, 1981, and continued through October, 1981. On August 29, 1981, the union sent the school board a mailgram which stated:

The members of the Norwin Education Association are willing to continue working for a reasonable period under all terms and conditions of the existing collective bargaining agreement while negotiations continue.

On September 6, 1981, after the expiration of the 1978-81 contract, the school board responded to the union by mailgram, stating:

The board accepts this offer and will maintain the status quo and will reinstate Blue Cross/Blue Shield coverage pending your advice that members will return to the classroom as you indicate.

The teachers did not return to work, however, nor did the school board reinstate Blue Cross/Blue Shield coverage until a new agreement was reached on October 31, 1981.

The standards for determining whether a work stoppage is a result of a lockout or a strike were first established by the Pennsylvania Supreme Court in

*Vrotney v. Unemployment Compensation Board of Review,* 400 Pa. 440, 163 A.2d 91 (1960),[3] and later refined in *Philco Corp. v. Unemployment Compensation Board of Review,* 430 Pa. 101, 242 A.2d 454 (1968), as follows:

Since the purpose of our unemployment compensation system is to compensate an individual when work has been denied him through no fault of his own, logically the test of whether a work stoppage resulted from a strike or a lock-out requires us to determine which side, union or management, first refused to continue operations under the status quo after the contract had technically expired, but while negotiations were continuing.

*Id.* at 103-04, 242 A.2d at 455.

The school district's first argument is that the school board's action did not constitute a breach of the status quo because (1) the Alpha and Blue Cross/Blue Shield plans are equivalent, or (2) the Alpha plan, rather than the Blue Cross/Blue Shield plan, constituted the status quo.

Initially, we note that the arbitration decision, holding the two plans to be not equivalent, is persuasive but not controlling, in that the board has the duty to make its own findings and conclusions. *Gagliardi*

---

[3] The Supreme Court stated the test as follows:

Have the employees offered to continue working for a reasonable time under the pre-existing terms and conditions of employment so as to avert a work stoppage pending the final settlement of the contract negotiations; and has the employer agreed to permit work to continue for a reasonable time under the preexisting terms and conditions of employment pending further negotiations? If the employer refuses to so extend the expiring contract and maintain the status quo, then the resulting work stoppage constitutes a "lockout". . . .

*Id.* at 444-45, 163 A.2d 93-94.

*Unemployment Compensation Case,* 186 Pa. Superior Ct. 142, 141 A.2d 410 (1958). The school district challenges most of the findings the board made regarding the non-equivalency of the two health plans.

The Alpha plan is not underwritten by an insurance company; rather, it is a part of the Pennsylvania School Board's Association Insurance Trust through which school boards throughout Pennsylvania provide a self-insured health plan for their employees. Because the specific Alpha plan used by Norwin School District incorporated the previous Blue Cross/ Blue Shield contracts into the Alpha contract, the substantive benefits provided by the two plans were identical. However, some conditions and procedures by which the benefits were "provided and guaranteed" were not identical. The board concluded that the differences, as summarized below, were significant enough to render the plans non-equivalent.

On July 1, 1981, thousands of physicians in the area were participating in Blue Cross/Blue Shield, but none were participating in Alpha. Unlike Blue Cross/Blue Shield, Alpha was not contractually[4] obligated to provide the privilege to convert to individual coverage upon separation from employment, nor the right to confidentiality of medical records.

The board also based its equivalency determination on the fact that, under Blue Cross/Blue Shield, but not under Alpha, employees could appeal claims decisions to the Pennsylvania Insurance Department. Although we do not believe that difference to be conclusive in itself because, under either plan, claimants have ultimate recourse to the courts, we do believe that the evidence substantially supports the board's conclusion that the Blue Cross/Blue Shield and Alpha plans are not equivalent.

---

[4] The terms of the contract rather than the descriptive brochure control the rights and obligations thereunder.

As noted, the school district alternatively argues that it did not breach the status quo because Alpha was in effect at the expiration of the collective bargaining agreement, and therefore Alpha, rather than Blue Cross/Blue Shield, constituted the status quo.

In support of its argument, the school district relies on the following language of Mr. Justice Nix in *Fairview School District v. Unemployment Compensation Board of Review*, 499 Pa. 539, 547, 454 A.2d 517, 521 (1982) : "Maintenance of the status quo is merely another way of stating that the parties must continue the existing relationship in effect at the expiration of the old contract." Earlier in the same opinion, however, Justice Nix had stated that the following definition of status quo, although generally employed in the context of preliminary injunctions, is equally applicable to labor disputes : "[T]he last actual, peaceable and lawful noncontested status which preceded the controversy." *Id.* at 547, 454 A.2d at 520.

Reading these two statements together indicates that the Supreme Court was referring only to the situation where the last peaceable, noncontested status was in fact the status upon expiration of the contract. That is clearly not the situation in this case where the last noncontested status ceased to exist before the expiration of the contract.[5] A "maintenance of status quo" standard is, by its very terms, inapplicable to a situation where the status quo was breached before expiration of the agreement. Restoration, rather than maintenance, of the status quo is required. Insofar as the collective bargaining agreement, as it existed be-

_____

[5] To apply the "maintenance of status quo" test urged by the school district to these circumstances would cause the absurd result that the party who breached the status quo *before* expiration of the agreement enjoys a more favorable position than it would had it breached the status quo *after* expiration. In the former situation, the new status would be the status quo regardless of the breach.

fore July 1, 1981, evidenced the last peaceable, non-contested status, the Blue Cross/Blue Shield coverage provided under that agreement constituted the status quo.

The school district further contends that, even if Alpha and Blue Cross/Blue Shield are not equivalent, so that the substitution was a breach of the status quo, the school board's offer of September 5, 1981 to reinstate Blue Cross/Blue Shield restored the status quo, thereby converting the continued work stoppage from a lockout to a strike. In *High v. Unemployment Compensation Board of Review,* 67 Pa. Commonwealth Ct. 472, 447 A.2d 701 (1982), this court recognized that the cause of a work stoppage can change in midsteam through the actions of the disputing parties.

> To hold that the status quo once altered could never be restored, or that only one party could conceivably, during the period of the labor dispute, be the cause of a work stoppage would serve to circumvent the [Unemployment Compensation] Law's underlying purpose of encouraging both the employer and the employee to "be sincere in their desire to maintain the continued operation of the . . . enterprise," and to discourage the subsidization of those employees whose unemployment is largely attributable to their own unwillingness to work under the status quo during the period of contract negotiations. (Footnote and emphasis deleted.)

*Id.* at 477-78, 447 A.2d at 704-05 (quoting *Vrotney,* 400 Pa. at 444, 163 A.2d at 93 (1960)).

In *High,* the school district unilaterally lengthened the teachers' workday after expiration of the collective bargaining agreement. The union rejected that measure, and offered to continue working under the terms of the previous collective bargaining agreement. When the lengthened workday plan was implemented,

the teachers went out on strike. Two days later, the school district offered to return to the shorter workday under the previous agreement, but the teachers rejected the offer and remained out on strike.

Applying the standard first articulated in *Hogan v. Unemployment Compensation Board of Review*, 169 Pa. Superior Ct. 554, 83 A.2d 386 (1951)—that the responsibility for a work stoppage is assessed against the party whose actions constituted the final cause thereof—we agreed with the board's conclusion that the school district's offer to reinstate the shorter workday was a restoration of the status quo, and that the teachers' refusal to return to work under those conditions converted the walkout into a strike as of the date of the school district's offer.

*High* is distinguishable, however, because here we actually have two conditional offers to restore the status quo: The school district offered to reinstate Blue Cross/Blue Shield if the teachers returned to work, and the teachers offered to return to work if the school district reinstated Blue Cross/Blue Shield. The problem arose because each party was waiting for the other to take the first step. Under these circumstances, the school district, as the party who initially breached the status quo, had the obligation to take the first step toward restoration by actually reinstating Blue Cross/Blue Shield rather than merely offering to do so on the condition that the teachers first return to work.

In *High*, the employer could not actually restore the status quo until the teachers returned to work. The most which could have been done was to offer in writing the restoration of the old schedule upon the teachers' return.

In this case, on the other hand, the school district could have restored the status quo while the teachers were out on strike by reinstating the Blue Cross/Blue

Shield coverage. Restoration of the status quo was not necessarily dependent upon the teachers returning to work, as it was in *High*. Here, the school district was able to do more than merely document its intention to reinstate Blue Cross/Blue Shield, and therefore a conditional offer to do so was not sufficient to restore the status quo. Thus, the lockout was not converted into a strike, and the teachers were eligible for unemployment compensation benefits.

Accordingly, we affirm.

#### ORDER

Now, January 31, 1984, the orders of the Unemployment Compensation Board of Review dated September 17, 1982, are affirmed.