620 A.2d 594

PHILADELPHIA HOUSING AUTHORITY

v.

PENNSYLVANIA LABOR RELATIONS BOARD and
Philadelphia Housing Police Association;

Appeal of PENNSYLVANIA LABOR
RELATIONS BOARD, Appellant.

Commonwealth Court of Pennsylvania.

Argued Nov. 18, 1992.

Decided Jan. 20, 1993.

James L. Crawford, for appellant.

Neal Goldstein and Kenneth M. Jarin, for appellee.

Alaine S. Williams for amici curiae, AFSCME, District Councils 33 and 47, Council 13, AFL–CIO and Philadelphia Federation of Teachers.

Samuel L. Spear for amici curiae AFSCME Local 394, Temple Assoc. of University Professors, Local 4531 and American Federation of Teachers.

Dennis A. Arouca for amici curiae, The Pennsylvania Local Government Conference, et al.

Mark J. Foley, Deputy City Solicitor for amicus curiae, City of Philadelphia and City of Pittsburgh.

Before CRAIG, President Judge, and DOYLE, COLINS, McGINLEY, SMITH, PELLEGRINI and KELLEY, JJ.

DOYLE, Judge.

This is an appeal by the Pennsylvania Labor Relations Board (Board) from an order of the Court of Common Pleas of Philadelphia County which reversed a Board decision holding that the Philadelphia Housing Authority (PHA) had violated Sections 1201(a)(1) and (5) of the Public Employe Relations Act,[1] (Act 195 or PERA) by unilaterally implementing, subsequent to the expiration of the relevant collective bargaining agreement, its final offer tendered during collective bargaining negotiations with the Philadelphia Housing Police Association (Union).

The relevant facts are as follows. The most recent collective bargaining agreement between PHA and the Union expired on March 31, 1990. The parties agreed to extend the contract for thirty days. During the period from March 15, 1990 to June 1, 1990 the parties participated in approximately nine bargaining sessions and also had five meetings with a state mediator. Tentative agreements were reached on some issues during this time period; however, all tentative agreements were conditional upon a complete and final agreement.

On June 1, 1990 PHA made a final offer to the Union. The offer contained all tentative agreements previously agreed upon including, *inter alia*, a provision pertaining to medical insurance. Under this provision, to be effective August 1,

---

1. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. § 1101.1201. This Section reads in pertinent part:

(a) Public employers, their agents or representatives are prohibited from:

(1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

. . . .

(5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

1990, only two HMO plans would have been made available free of charge to Union members; this represented a reduction from four plans previously available to employees on a no cost basis. On June 3, 1990 the Union, at one of its meetings, rejected the entire proposal.

Approximately six weeks later, on July 10, 1990, the Union submitted a counterproposal to PHA. Its counterproposal contained substantial differences from PHA's final offer including wage increases and a suggestion that the collective bargaining agreement be limited to one year in duration rather than three as proposed by the PHA. The Union's counterproposal did not express any objection, however, to the reduction of no-cost HMO's from four to two. That same day PHA rejected the Union's counterproposal. Soon thereafter counsel for PHA wrote separately to the state mediator, on July 12, 1990, and to counsel for the Union, on July 17, 1990, stating the fact that negotiations had been at an impasse for several weeks. He also advised counsel for the Union that PHA would, over the ensuing several weeks, implement its June 1, 1990 proposal including the pension, wage and medical insurance provisions. As of August 1, 1990 PHA did so, while the Union members continued to work.

The Union filed an unfair labor practice charge with the Board alleging that PHA had breached its statutory obligation to bargain in good faith by unilaterally implementing its final offer.[2] The hearing examiner determined that PERA requires that the parties must bargain "to the point of impasse" and he expressed as "the critical inquiry ... whether the parties reached impasse in their negotiations before the Authority implemented its proposal." He found that the parties had bargained in good faith and that an impasse had been reached adopting the Supreme Court's definition of "impasse" found in *Norwin School District v. Belan*, 510 Pa. 255, 507 A.2d 373 (1986):

2. The *only* specific provision challenged in the unfair labor practice charge was the one dealing with the provision for the HMO medical care coverage. The charge does, however, indicate that other terms and conditions of the recently expired collective bargaining agreement were altered.

The definition of an "impasse" is that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless—but its application can be difficult. Given the many factors commonly itemized by the [National Labor Relations] Board and courts in impasse cases, perhaps all that can be said with confidence is that an impasse is a "state of facts in which the parties, despite the best of faith, are simply deadlocked."

*Id.* at 267 n. 9, 507 A.2d at 380 n. 9 (quoting R.A. Gorman, *Basic Text in Labor Law, Unionization and Collective Bargaining,* 445–47 (1976) (citations omitted)).[3]

In adopting the definition of impasse in *Norwin,* the Supreme Court looked to federal labor relations case law which basically envisions a halt to the dispute resolution process due to deadlock. As the term "impasse" is used in public sector law under PERA, however, it can *also* mean the end of the statutory dispute resolution process, as well as deadlock.[4]

3. Footnote 9 is taken from the opinion announcing the judgment of the Court, affirming the order of the Commonwealth Court at 80 Pa. Commonwealth Ct. 67, 471 A.2d 904 (1984). This opinion, authored by Chief Justice Nix, was joined by Justice Papadakos; Justice Zappala and Justice Larsen concurred in the result, and Justice McDermott and Justice Hutchinson dissented. Justice Flaherty did not participate in the decision. Plurality opinions of the Supreme Court are not binding precedent, *LeGare v. Unemployment Compensation Board of Review,* 498 Pa. 72, 78 n. 3, 444 A.2d 1151, 1154 n. 3 (1982); 2 Darlington, McKeon, Schuckers & Brown, *Pennsylvania Appellate Practice* § 3102:2, at 83 (1986), although neither the concurring nor dissenting opinion speaks to a different understanding of when an impasse occurs.

4. Under Article VIII of PERA, 43 P.S. § 1101.801–1101.806a, if, after a "reasonable period of negotiation, a dispute or impasse exists" the parties "may voluntarily submit to mediation, but if no agreement is reached between the parties within twenty-one days after negotiations have commenced ... and mediation has not been utilized by the parties, both parties" are to notify the Pennsylvania Bureau of Mediation. *See* 43 P.S. § 31101.801. PERA further directs that once mediation has commenced it is to continue for as long as the parties have not reached an agreement. If no agreement has been reached 20 days after mediation has begun, but in no event later than 120 days prior to the "budget submission date," the Bureau of Mediation is to notify the Board which may then in its discretion appoint a fact finding panel (not done in this case). The panel is then to submit its recommendations to

Ultimately, the hearing examiner determined, again relying on federal labor relations law, that because the parties had reached an impasse and the HMO provision had been tentatively agreed upon by both sides as early as March 28, 1990, the implementation of the final offer did not violate Section 1201 of PERA.

The hearing examiner reached his decision by fundamentally relying upon *Western Newspaper Publishing*, 269 NLRB 355 (1984), an opinion which interpreted the National Labor Relations Act. Based on this interpretation of the federal act, he concluded that PHA had fulfilled its bargaining obligations and implemented its final offer only after impasse had been reached and, thus, that no unfair labor practice had been committed.

On November 12, 1991, the Board upheld the hearing examiner's findings including the finding that an impasse existed at the time PHA implemented its final offer, but it rejected the hearing examiner's legal conclusion that there had been no unfair labor practice under Section 1201 of PERA.[5] In so doing the Board opined that the hearing examiner's reliance on federal law was misplaced in this instance because of the important distinctions between public

the Board and the parties must determine whether or not they will accept the recommendations.

This is in contrast to federal labor relations law which has no statutory impasse procedures. A finding of impasse under federal law depends upon (1) the bargaining history of the parties, (2) the good faith of the negotiations, (3) the length of the negotiations, (4) the significance of the issues over which the disagreement exists and (5) the contemporaneous understanding of the parties as to the state of negotiations. *See Taft Broadcasting Co.*, 163 NLRB 475, 64 LRRM 1386 (1967), *aff'd sub nom., American Federation of Television and Radio Artists, AFL-CIO, Kansas City Local v. National Labor Relations Board*, 395 F.2d 622 (D.C.Cir.1968).

5. The Board itself is vested with the ultimate authority to determine if there has been an unfair labor practice. 43 P.S. § 1101.1301. However er all formal hearings are conducted by a hearing examiner designated by the Board, 34 Pa. Code § 95.91, whose proposed decision to the Board will become final if no exceptions are filed within twenty days, 34 Pa. Code § 95.95(b), or unless the Board itself on its own motion determines to review the proposed decision, 34 Pa. Code § 95.98(d). In this case the Union filed exceptions to the hearing officer's proposed decision and order with the Board.

and private sector law. The Board explained its view that *two* preconditions must exist before an employer bound by PERA may implement a unilateral action: an impasse *and* cessation of work. Thus, the Board used a different underlying predicate to express the critical inquiry, which we would formulate as: whether the parties had reached impasse in their negotiations under PERA *and* were the members of the bargaining unit on strike when the Authority unilaterally implemented its proposal.

It is undisputed in this case that only the first of these conditions existed on August 1, 1990.[6] Based on its legal conclusions the Board entered an order that PHA cease and desist from interfering with the rights of Union employees as guaranteed by PERA and cease and desist from refusing to bargain collectively in good faith with the Union. It also directed PHA to rescind the unilateral implementation of its final offer and restore the status quo ante "except insofar as the employees may have received wage and benefit improvements which should not be disturbed" and to make the employees whole for any loss of benefits or wages due to the unilateral action.

Thereafter, PHA appealed to the Court of Common Pleas of Philadelphia County which disagreed with the Board's legal conclusions opining that Pennsylvania case law did not *compel* the result reached by the Board, and, looking to federal law and the law of other states as persuasive, the lower court reversed the Board. The Board's appeal to this Court followed.

On appeal the Board presents two principal issues for our review. First, it contends that the trial court exceeded its scope of review by impermissibly substituting its judgment for that of the Board. Second, it asserts that PHA violated Section 1201 of PERA by implementing its final offer after a statutory impasse had occurred but in the absence of any Union strike.

6. In fact, it appears no strike has ever occurred.

■ Our general scope of review in Board cases where the case goes first to the common pleas court[7] is to determine whether the *Board's* findings are supported by substantial evidence and whether the conclusions drawn from those findings are reasonable and not illegal, arbitrary or capricious. *St. Joseph's Hospital v. Pennsylvania Labor Relations Board,* 473 Pa. 101, 373 A.2d 1069 (1977); *Abington Transportation Assn. v. Pennsylvania Labor Relations Board,* 131 Pa. Commonwealth Ct. 267, 570 A.2d 108 (1990).[8]

■ Our scope of review is identical to that which the common pleas court must use in its review of the Board's findings. While acknowledging this narrow and limited judicial review, however, the trial court stated that in its view, "the Board misinterpreted and misrelied on the decisions that are factually distinct from the instant case, leading the Board to err in its conclusions of law." The court, therefore, found that the Board had committed errors of law, as distinguished from errors in its findings of fact, and on grounds of public policy reached contrary conclusions to those reached by the Board. The trial court, relying on federal private sector labor law, found that PHA had not committed an unfair labor practice by unilaterally changing the terms and conditions of the expired collective bargaining agreement. In effect, the court substituted its own discretion, formulated on broad grounds of public policy, for that of the Board. This was error because policy considerations are within the Board's expertise and deference to that expertise is required. *Appeal*

7. Commonwealth Court has direct appellate jurisdiction over appeals from the Pennsylvania Labor Relations Board where charges are filed under Act 111, the Act of June 24, 1968, P.L. 237, 43 P.S. §§ 217.1— 217.10, and appeals filed under PERA/Act 195 which involve Commonwealth employees; all other appeals under PERA are first filed with the courts of common pleas. 42 Pa.C.S. §§ 763, 933. *See also Delaware County Lodge No. 27 v. Pennsylvania Labor Relations Board,* 497 Pa. 319, 440 A.2d 512 (1982).

8. *See also Harbaugh v. Pennsylvania Labor Relations Board,* 107 Pa. Commonwealth Ct. 406, 411 n. 2, 528 A.2d 1024, 1026 n. 2 (1987) (declining to apply the standard set forth in *Estate of McGovern v. State Employees' Retirement Board,* 512 Pa. 377, 517 A.2d 523 (1986), to cases appealed first to the common pleas court).

of *Cumberland Valley School District*, 483 Pa. 134, 394 A.2d 946 (1978).

Pennsylvania case law is clear that private-sector federal labor law has only a limited application to PERA cases and should be looked to for guidance only where it has "no meaningful difference in policy" from *PERA*. *Cumberland Valley.* [9] As our Supreme Court stated in *Pennsylvania Labor Relations Board v. State College Area School District,* 461 Pa. 494, 337 A.2d 262 (1975):

Although these [federal] decisions may provide some guidance, we are mindful of the distinctions that necessarily must exist between legislation primarily directed to the private sector and that for public employes. The distinction between the public and private sector cannot be minimized. Employers in the private sector are motivated by the profit to be returned from the enterprise whereas public employers are custodians of public funds and mandated to perform governmental functions as economically and effectively as possible. The employer in the private sector is constrained only by investors who are most concerned with the return for their investment whereas the public employer must adhere to the statutory enactments which control the operation of the enterprise. *We emphasize that we are not suggesting that the experience gained in the private sector is of no value here, rather we are stressing that analogies have limited application and the experiences gained in the private employment sector will not necessarily provide an infallible basis for a monolithic model for public employment.*

9. In *Cumberland Valley* the collective bargaining agreement had expired on June 30, 1975 and immediately thereafter, while the collective bargaining was in process, the employer school district terminated benefits for the life and health insurance plans which the district had been obligated to provide under the expired agreement. The Supreme Court held that, *in that situation,* there was no meaningful difference in policy between the National Labor Relations Act and PERA, relying primarily on National Labor Relations Board decisions and federal case law. The Court sustained the decision of the Board that the school district had committed an unfair labor practice, quoting from *Pennsylvania Labor Relations Board v. Butz,* 411 Pa. 360, 377, 192 A.2d 707, 716 (1963).

We also recognize the wisdom of refraining from attempting to fashion broad and general rules that would serve as a panacea. The obviously wiser course is to resolve disputes on a case-by-case basis until we develop, through experience in the area, a sound basis for developing overall principles.

*Id.* at 499–500, 337 A.2d at 264–65 (footnote omitted) (emphasis added).

Keeping paramount, therefore, the Supreme Court's admonition regarding the distinction between public and private sector law, it is necessary to examine the goal PERA sought to achieve so as to determine for purposes of the legal issue presented here whether PERA has any "meaningful difference in policy" from federal labor relations law. *Cumberland Valley.* Section 101 of PERA declares:

The General Assembly of the Commonwealth of Pennsylvania declares that it is the public policy of this Commonwealth and the purpose of this act to promote orderly and constructive relationships between all public employers and their employes subject, however, to the paramount right of the citizens of this Commonwealth to keep inviolate the guarantees for their health, safety and welfare. Unresolved disputes between the public employer and its employes are injurious to the public and the General Assembly is therefore aware that adequate means must be established for minimizing them and providing for their resolution. Within the limitations imposed upon the governmental processes by these rights of the public at large and recognizing that harmonious relationships are required between the public employer and its employes, the General Assembly has determined that the overall policy may best be accomplished by (1) granting to public employes the right to organize and choose freely their representatives; (2) requiring public employers to negotiate and bargain with employe organizations representing public employes and to enter into written agreements evidencing the result of such bargaining; and (3) establishing procedures to provide for the protection of the rights of the public employe, the public employer and the public at large.

To achieve its end, PERA directs mandatory collective bargaining to take place over wages, hours and other terms and conditions of employment, see Section 701 of PERA, 43 P.S. § 1101.701, and, in exchange, most public employees are given a right to strike. That right, however, is greatly curtailed by PERA, no doubt in recognition of the negative impact on the public when government services are not forthcoming.

In considering the distinctions between public and private sector law and the purpose of PERA, it is also useful to examine the purpose of collective bargaining in the federal sector and then to look at the economic weapons normally available to the parties in a private sector labor dispute and compare them with those available under PERA. Initially, we recognize that the purpose of a collective bargaining agreement in private-sector federal law is to assist employees in counteracting an employer's almost complete control over employment concerns. Bowman, *An Employer's Unilateral Action—An Unfair Labor Practice?* 9 Vand.L.Rev. 487, 490 (1956). This purpose is very different from that espoused in PERA. Consequently, in private-sector federal law a strike is recognized as a legitimate and powerful economic weapon available to employees. Its sanctity has been expressly preserved by the National Labor Relations Act, 29 U.S.C. §§ 151–169. *See National Labor Relations Board v. Erie Resistor Corp.,* 373 U.S. 221, 83 S.Ct. 1139, 10 L.Ed.2d 308 (1963). A strike is not precluded during the course of contract negotiations, nor is it viewed as inconsistent with such negotiations. But it *is* under Section 1002 of PERA, 43 P.S. § 1101.-1002.

Under the National Labor Relations Act, strikes are part and parcel of the collective bargaining process. *National Labor Relations Board v. Insurance Agents' International Union,* 361 U.S. 477, 494–95, 80 S.Ct. 419, 430, 4 L.Ed.2d 454 (1960). Thus, generally speaking, absent a collective bargaining agreement provision containing a no-strike clause, *see Boys Markets, Inc. v. Retail Clerks Union, Local 770,* 398 U.S. 235, 90 S.Ct. 1583, 26 L.Ed.2d 199 (1970), or a situation where a strike will affect an entire industry or a substantial

part thereof and imperil the national health, safety or welfare, *see* 29 U.S.C. § 178, a strike will not be enjoined.

The unilateral implementation of an employer policy during negotiations (which can be viewed as employer's economic weapon) however, is generally prohibited in private-sector federal law, because it is viewed as inconsistent with good faith negotiation. *National Labor Relations Board v. Katz,* 369 U.S. 736, 743, 82 S.Ct. 1107, 1111, 8 L.Ed.2d 230 (1962). Thus, absent an impasse (*i.e.,* deadlock) in which the duty to bargain temporarily terminates, unilateral implementation is not permitted. To summarize then, in a private sector labor market, labor's right to strike is jealously guarded and virtually unfettered while management's corresponding right to unilaterally change contract terms is curtailed only moderately, *i.e.,* permitted only after impasse. Thus, there is an effort to afford the parties some balance in the economic weapons available to them.

In contrast to the private sector endorsement of strikes, however, public sector law in Pennsylvania has traditionally not recognized such a right. While PERA now recognizes such a right for most public employees, the right to strike is much more circumscribed than under federal law. Strikes can be implemented only when statutorily prescribed impasse procedures are exhausted, *see* 43 P.S. §§ 1101.1002–1101.1003, and can be enjoined where they create a "clear and present danger or threat to the health, safety or welfare of the public." 43 P.S. § 1101.1003. Thus, the right to strike under PERA is far more limited than under federal private sector law.

When one recognizes that the employer's counterbalancing economic weapon, a unilateral implementation, is circumscribed in situations where a *broad* right to strike is recognized, how much more cogently should it follow that it should be no less circumscribed where strike rights are much more limited. And that brings us to the question now facing us. Is the use of such an employer weapon where a statutory impasse has been reached, but no strike has ensued, a violation of Section 1201 of PERA?

As all parties and amici agree (or concede) there is no express authority in PERA for unilateral implementation after an impasse has occurred.[10] And, we believe that to infer that such a major substantive provision exists in the "penumbra" of PERA would be the height of judicial legislation. Consequently, if public employers feel they need more economic weapons in their arsenal, it is to the legislature that they must turn.

Further, and above all other considerations, we cannot conclude under *St. Joseph's* that the *Board,* the acknowledged expert in this area reached an unreasonable conclusion when it opined:

> In our view, it would not serve the legislature's declared goal of promoting orderly and constructive relationships between public employers and their employes through good faith collective bargaining to allow a public employer to implement its final offer when the employes in the unit have not disrupted the continuation of public services by striking. Unilateral action by an employer during a period of no contract while employes continue to work serves to polarize the process and would encourage strikes by employes who otherwise may wish to continue working under the terms of the expired agreement while negotiations continue.

We believe that a public employer is less likely to negotiate in good faith with a sincere desire to reach mutual agreement if it knows that it may implement *its* final offer after only 21 days of negotiation and 20 days of mediation (assuming that a fact finder is not appointed). Good faith negotiation would be seriously jeopardized by permitting the employer to implement its bargaining position after a few face-to-face bargaining sessions and the requisite number of mediation sessions with the mediator. The employer's unilateral achievement of its bargaining position effectively relieves pressure on it to arrive at a mutually agreed

10. PHA contends that unilateral implementation is an inherent managerial prerogative whose viability was unaltered by PERA. *See State College.* We disagree that it remains unaltered because to so rule would seriously undermine the bargaining power PERA granted to public employees.

resolution of the bargaining impasse. It is the tension created by the need to find common ground between the parties which is at the core of the process. Relieving that tension greatly removes the incentive of a party to bargain with a sincere desire to reach agreement.

It is abundantly clear that the trial court, in reversing the Board's decision did so on the basis of its own view of what declared public policy under PERA should be. In commenting critically on the Board's interpretation of PERA, as above quoted, the Court opined:

The Board's view fails, however, to take into account the competing interests of public employers, employees and the citizens of the Commonwealth which Act 195 [PERA] seeks to balance.

This oversight renders the Board's decision unreasonable since, by holding that an employee organization is entitled to an indefinite extension of an expired contract so long as it does not strike, the Board upsets the balance built into Act 195 [PERA] by making the interests of public employees paramount.

The trial court then proceeded to explain its own view of public policy by analyzing the present economic conditions facing cities with "ever rising costs and dwindling public funds." But even if the courts' view of the present marketplace economy were true, the General Assembly did not enact PERA to be applied solely in an unchanging and stagnate economic climate, and, more to the point, under the trial court's own analysis, exactly the opposite result would occur in a healthy and expanding economic climate, that is, the "balance built into" PERA would then be skewed against the public employees.

We view the essential issue then as which adjudicatory body did the General Assembly invest with the responsibility of interpreting public policy under PERA? On this account we believe that the Supreme Court has made it clear that "[this Court] will not lightly substitute its judgment for that of a body selected for its expertise [the Board] whose experience and expertise make it better qualified than a court of law to

weigh facts within its field." *Appeal of Cumberland Valley School District,* 483 Pa. 134, 139–40, 394 A.2d 946, 949 (1978), quoting *Pennsylvania Labor Relations Board v. Butz,* 411 Pa. 360, 377, 192 A.2d 707, 716 (1963).

Accordingly, based upon the foregoing discussion, and concluding that the trial court substituted its judgment regarding labor policy for that of the Board, we reverse the order of the court of common pleas and reinstate the Board's order.

## ORDER

NOW, January 20, 1993, the order of the Court of Common Pleas of Philadelphia County in the above-captioned matter is hereby reversed and the order of the Pennsylvania Labor Relations Board is reinstated.

SMITH and PELLEGRINI, JJ., concur in the result only.

COLINS, Judge, dissenting.

I must respectfully dissent from the eloquent and well-researched opinion of Judge Doyle for two reasons.

First, I disagree that the General Assembly has invested the Board with the sole and conclusive authority of interpreting public policy under PERA. This Court and ultimately the Supreme Court are vested with the constitutional authority and responsibility of interpreting the declared public policy intent of any legislation and deciding what parameters shall be placed upon any quasi-judicial body's ability to interpret legislation applicable to all citizens of the Commonwealth. In *Metropolitan Property and Liability Insurance Company v. Insurance Commissioner,* we stated that "[w]hen the words of a statute are not explicit, this Court must ascertain and effectuate the intention of the General Assembly." 97 Pa. Commonwealth Ct. 219, 222, 509 A.2d 1346, 1348 (1986), *affirmed,* 517 Pa. 218, 535 A.2d 588 (1987).

Similarly, the United States Supreme Court has observed: "Undoubtedly questions of statutory interpretation, especially when arising in the first instance in judicial proceedings, are for the courts to resolve, giving appropriate weight to the

judgment of those whose special duty is to administer the questioned statute." *National Labor Relations Board v. Hearst Publications, Inc.,* 322 U.S. 111, 130–131, 64 S.Ct. 851, 860, 88 L.Ed. 1170 (1944).

In the instant matter, the Board is delegated the exclusive function to decide cases arising under PERA in the first instance. *Appeal of Cumberland Valley School District,* 483 Pa. 134, 394 A.2d 946 (1978). However, this delegation of authority does not mandate that the courts abdicate their responsibility and authority to interpret PERA. The trial court acted within this authority when it concluded that the Board made errors of law.

Second, the ramifications of the instant opinion create a precedent that compels municipal corporations or authorities to continue to operate indefinitely under expired labor agreements regardless of the financial impossibility of doing so. To compel any municipality to maintain financial commitments in perpetuity in the face of a declining population or a shrinking tax base or any other adverse circumstance, creates a precedent in this Commonwealth which is most dangerous and is contrary to the public interest.

As the majority acknowledges, PERA limits public employees' right to strike in recognition of the negative impact on the public when government services are not forthcoming. This limitation on the right to strike, however, does more than simply protect the public; it achieves a tenuous balance in bargaining power between the public sector employer and public employees. The majority's decision weakens PERA's limitation on public employees' right to strike and accordingly threatens the delicate balance of bargaining power between employer and employee in the public sector.

I would affirm the opinion of the trial court in the instant matter.

KELLEY, J., joins in this dissenting opinion.