**MORRISVILLE SCHOOL DISTRICT, Appellant,**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD and Morrisville Educational Support Personnel Association.**

Commonwealth Court of Pennsylvania.

Argued Feb. 6, 1996.

Decided Dec. 16, 1996.

Reargument Denied Jan. 28, 1997.

---

William F. Thomson, Jr., Fairless Hills, for appellant.

Peter Lassi, Harrisburg, for appellee, PLRB.

Lynne L. Wilson, Harrisburg, for appellee, Morrisville Educational Support Personnel Association.

Before PELLEGRINI and FLAHERTY, JJ., and NARICK, Senior Judge.

FLAHERTY, Judge.

Morrisville School District (District) appeals from an order of the Court of Common Pleas of Bucks County (trial court) which affirmed the decision of the Pennsylvania Labor Relations Board (Board) after it had reversed the hearing examiner. The Board concluded that District violated subsections 1201(a)(1) and (5) of the Public Employe Relations Act (PERA or Act).[1]

District and Morrisville Educational Support Personnel Association (Union) were parties to a collective bargaining agreement which expired on June 30, 1993, for the secretarial, custodial and maintenance employees of District. Negotiations toward a new

---

[1] Act of July 23, 1970, P.L. 563, *as amended*, 43 P.S. § 1101.1201(a)(1), (5). The relevant portions of 43 P.S. § 1101.1201(a)(1), (5) provide:

Section 1201. (a) Public employers, their agents or representatives are prohibited from: (1) Interfering, restraining or coercing employes in the exercise of the rights guaranteed in Article IV of this act.

. . . .

(5) Refusing to bargain collectively in good faith with an employe representative which is the exclusive representative of employes in an appropriate unit, including but not limited to the discussing of grievances with the exclusive representative.

43 P.S. § 1101.1201(a)(1), (5).

collective bargaining agreement commenced on January 8, 1993, when Union demanded, among other things, an 8% increase each year for three years and District offered no increases for four years. From January 8, 1993 until July 12, 1993, a total of seven bargaining sessions were held between chief District negotiator William Thomson (Thomson) and Nancy Noonan (Noonan), who represented Union.

At the third bargaining session on March 19, District notified Union of its investigation into subcontracting out custodial and secretarial services. On March 31, 1993, by letter, Union reduced its wage increase demands to 5%, 5%, 4% and 4%, respectively, over four years. At the April 1 meeting, District made concessions on some benefits and proposed salary freezes in the first two years and increases of 1% and 2% in years three and four.

On May 3, 1993, District provided Union for the first time with a three-page handout setting forth the contractors' services, costs and savings to District should it decide to subcontract the services. Union requested District to provide the specifications, bid forms, administrative fees, job descriptions and supply of materials. About two weeks later District received formal quotes from subcontractors, furnished Union with the information it had requested and informed Union that the school board would make its final decision on subcontracting at its June 23 meeting.

On June 2, 1993, District reduced its salary proposals, from an increase of 0%, 0%, 1% and 2% over the next four years to a 20% decrease in the first year and a 5% increase for the next three years. In addition, District eliminated previously paid family health insurance, dental coverage and life insurance, and notified Noonan that their next bargaining session would take place on June 8. On June 7, Noonan contacted Thomson by letter to express Union's concerns regarding the direction of the negotiations. On June 8, Noonan canceled the bargaining session scheduled for that evening on the basis that she did not have adequate notice of the meeting or adequate opportunity to review the subcontracting information so as to develop a meaningful counterproposal.

On June 15, Thomson sent Noonan a letter, via overnight mail, stating that the parties were at impasse. On June 22, Thomson notified Noonan that the decision on subcontracting would be extended until the school board meeting on July 7. Thomson also enclosed in this June 22 letter District's same June 2 proposal (except with the additional proposal to reinstate the $25,000 life insurance policy, which was in previous contracts). This June 22 proposal cost District $48,000 more than subcontracting would have. The total cost of subcontracting was estimated to be $2,042,000 over the four-year period being negotiated. On June 23, District adopted a budget for the 1993–94 fiscal year which reduced the real estate tax levy by 6 mills or $90,000. The portion of District's budget which covered union members was correspondingly reduced by $90,000.

On July 2, Noonan met with Union's membership who discussed District's June 2 proposal, as well as the issue of subcontracting, and agreed to oppose District's 20% cutback in wages in the first year.

At what turned out to be their next to last and sixth negotiating session on July 6, the parties seriously discussed subcontracting for the first time. Noonan sought clarification of information received, as well as more information regarding the subcontracting proposals, and stated that Union would present a proposal at the next bargaining session.

In a letter dated July 8, Thomson notified Noonan that District's final deadline to decide the subcontracting issue would be extended for the last time until July 14 at 7:30 p.m. On July 12, Union provided District with a proposal of 0%, 3%, 4% and 5% increases over four years, respectively, which was rejected by District, who refused to make a counterproposal. Union, nevertheless, then further reduced its demand and proposed increases of 0%, 2%, 2% and 3% over four years, which were also rejected by District without making a counterproposal. Noonan then requested additional information regarding subcontracting and indicated that she could not come close to District's final proposal at that time without getting

authorization from the membership to reduce the proposal of Union further. (R.R. 169a, F.F.39.)[2] Noonan then suggested dates for additional bargaining sessions after the deadline set by District. Although District agreed to meet on July 13 or 14, District did not accept Union's offer to keep bargaining after the deadline of July 14.

On July 13, at 4:24 p.m., District faxed Noonan, indicating that District again believed the parties were at impasse. On July 14, Noonan faxed District a response, stating that the parties were not at impasse and that Union would file an unfair labor practice charge against District if it voted to subcontract. At about 3 or 4 p.m. on July 14, District contacted Noonan by phone to inform her that District had the answers to the questions posed by Union on July 12 and suggested that she send a runner to pick them up. Noonan explained that she was unable to send a runner. A few hours later that same evening (July 14, 1993), District voted to subcontract the services of the bargaining unit to two private contractors—one for custodial services and one for secretarial services.

On July 16, 1993, Union filed charges of unfair labor practices alleging that District violated Sections 1201(a)(1) and (5) of the Act. The hearing examiner issued a Proposed Decision and Order dismissing the charges and rescinding Union's complaint. The Board vacated and set aside the hearing examiner's Decision and Order. District thereafter filed a Petition for Review with the trial court from the Board's Final Order. In an Opinion and Order dated August 9, 1995, the trial court affirmed the Board's Final Order, finding that District failed to bargain in good faith. This appeal followed.

■ Our standard of review in an unfair labor practice case that is first reviewed by the common pleas court is the same standard as that which applies to the trial court and is limited to determining whether the Board's findings are supported by substantial evidence and whether the conclusions drawn

therefrom are reasonable and not capricious, arbitrary or constitute an error of law. *Philadelphia Housing Authority v. Pennsylvania Labor Relations Board,* 153 Pa.Cmwlth. 20, 620 A.2d 594, *petition for allowance of appeal denied,* 536 Pa. 634, 637 A.2d 294 (1993).

■ Good faith bargaining requires the parties to make a serious effort to resolve differences and to reach common ground. *Minersville Area School District v. Pennsylvania Labor Relations Board,* 82 Pa.Cmwlth. 506, 475 A.2d 962 (1984). The duty to bargain in good faith extends to the subject of subcontracting bargaining unit work. *Pennsylvania Labor Relations Board v. Mars Area School District,* 480 Pa. 295, 389 A.2d 1073 (1978). An employer has the obligation to bargain in good faith to a bona fide impasse before subcontracting any bargaining unit work. *Borough of Wilkinsburg v. Sanitation Department,* 16 Pa.Cmwlth. 640, 330 A.2d 306, *aff'd,* 463 Pa. 521, 345 A.2d 641 (1975). Here, the Board and the trial court rely almost entirely on District's failure to make a counterproposal to the July 12 Union proposals as the key evidence supporting their conclusion of District's refusal to bargain in good faith.

Although District argues generally that the Board made findings not supported by substantial evidence, ignored credible evidence of District's good faith and made arbitrary and unreasonable conclusions therefrom, there are two basic issues here: Did District refuse to bargain in good faith (1) when it failed to make a counterproposal to Union's two proposals on July 12, as held by the Board and the trial court, and/or (2) when District insisted there was an impasse and subcontracted out the bargaining unit's work. District asserts that the parties were at impasse so that its failure to make a counterproposal in July, 1993, is not, per se, a refusal to bargain in good faith but is merely one piece of evidence to be considered in the totality of the circumstances. In support of its position that it satisfied its

---

**2.** Finding of Fact No. 39 cites "N.T. 98" as the basis for Noonan believing that, as of July 13, she "could not come close at that time" to meeting the terms of the proposed subcontract, but that

part of the transcript clearly indicates that the discussion took place at the July 12, 1993, meeting.

duty of good faith bargaining, District cites the cases of *Borough of Wilkinsburg,* and *Mars Area Association of School Service Personnel v. Pennsylvania Labor Relations Board,* 114 Pa.Cmwlth. 152, 538 A.2d 585 (1987).

■ District correctly argues that it was not guilty of bad faith because it failed to make a counterproposal to Union's July 12 proposal. District did not have to accept Union's proposals and was not required to make a counterproposal. Section 701 of the Act, 43 P.S. § 1101.701, which defines the duty to bargain, expressly preserves the right of either party to refuse to agree to any proposal or to refuse to make a concession to the other side.[3] Nevertheless, District still had the obligation to bargain in good faith to an impasse before subcontracting. *Wilkinsburg.* Although an employer cannot be forced to make a concession on a particular issue or to accept a specific proposal, part of an employer's obligation of good faith bargaining is the responsibility to "make a serious effort to resolve differences and reach a common ground." *Appeal of Cumberland Valley School District,* 483 Pa. 134, 142, 394 A.2d 946, 950 (1978). The failure to make a counterproposal, however, may constitute some evidence of an overall failure to make a serious effort at resolving differences and reaching a common ground, but, by itself, it is within the protection of Section 701.

■ District's problem is not, as the Board insists, that District failed to make a counterproposal after it had made it clear to Union that it had exceeded its bottom line in its last counterproposal, which exceeded the subcontractor's bid. District had every right under Section 701 of the Act to refuse to make another counterproposal. District's problem is that it refused to continue bargaining while Union was not through negotiating. District subcontracted under circumstances where Union had just made two substantial unanswered proposals reducing

its demand for wage increases totaling 18% prior to July 12 to a total of 7% (averaging 1–3/4% per year) over four years, with a freeze in the first year, while bidding against itself in so doing. Union clearly indicated its desire to continue bargaining but needed more time to have another meeting of the membership to obtain authority for further bargaining proposals or, possibly, to join District in admitting they were at impasse by words or actions. Unfortunately, District did not grant that extension, even though Union's previous request for an extension of time on June 8 resulted in a July 2 meeting with the membership that produced the substantial moves of July 12 and greatly narrowed the gap toward District's pre-rollback position before it received the bids on subcontracting in the middle of May.

Union obviously needed more time, first, to obtain and analyze the latest information requested from District two days earlier but not made available to Union until a few hours before District contracted out and, second, to convince its members that District had reached its bottom line. District's rigid, inflexible adherence to its line in the sand of July 14 might be a normal bargaining ploy in other circumstances but here it constitutes some evidence of a lack of good faith when combined with the facts that Union had just made the most significant moves in this bargaining process two days before, that time appeared not to be of the essence during the three preceding months as only two serious negotiating sessions on the issue of subcontracting were held during the one week period preceding District's unilateral declaration of impasse, that there was no strike in effect or threatened and that school was not even in session.

Although District has a right to formulate an economic objective in its negotiations, to refuse to accept Union's proposals and to refuse to make a counterproposal, it did not

3. Section 701 of PERA reads:

Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes *to meet at reasonable times and confer in good faith* with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but *such obligation does not compel either party to agree to a proposal or require the making of a concession.*

43 P.S. § 1101.701 (emphasis added).

have the right at this point in negotiations to unilaterally terminate negotiations, walk away from the bargaining table and contract out the work of bargaining unit members while Union showed strong indications of attempting to move closer to, or possibly accept, District's clearly announced goal of greatly reducing its costs, even to the extent of Union's countering its own proposals which were answered only by rejection by District.

District further evidenced a lack of good faith on the day after the July 12 session when, in response to Union's request for time to meet with its membership and to schedule more bargaining sessions, District faxed Union a second unilateral declaration that the parties had again reached an impasse. Even after Union responded the next day that the parties had not reached an impasse and, on the following day, District notified Union that it had answers to Union's questions on subcontracting, District unilaterally adhered to its self-imposed deadline, terminated negotiations and voted to subcontract the bargaining unit work that same evening, before Union had an opportunity to view and analyze the latest information District had prepared that very same day.

Nevertheless, District's final argument is that it was relieved of its duty to further bargain because it had reached the point of impasse. We must, therefore, examine whether an impasse actually occurred here. An impasse has been defined as

> that point at which the parties have exhausted the prospects of concluding an agreement and further discussions would be fruitless.... [P]erhaps all that can be said with confidence is that an impasse is a 'state of facts in which the parties, despite the best of faith, are simply deadlocked.'
>
> An employer may, after bargaining with the union to a deadlock or impasse on an issue, make unilateral changes that are reasonably comprehended within his preimpasse proposals....

*Norwin School District v. Belan,* 510 Pa. 255, 268 n. 9, 507 A.2d 373, 380 n. 9 (1986). Contrary to District's assertions, the facts presented in *Wilkinsburg* and *Mars* are not analogous to those now before us. Here, the facts are more similar to *Minersville,* where the employer contracted out after only one meeting on subcontracting even though the union indicated a willingness to cooperate, a situation not much different than here, where only two meaningful meetings on subcontracting were held. The employers in *Wilkinsburg* and *Mars* negotiated the specific issue of subcontracting in numerous bargaining sessions over subcontracting for several months, as opposed to only two such meetings here. In *Wilkinsburg,* the employer was seeking an agreement to reduce labor costs and the union steadfastly refused to agree to any concessions, including the opportunity to match the costs of contracting the labor out. In *Mars,* there were ten bargaining sessions on subcontracting alone during the same period as here where only two sessions were held when subcontracting numbers were on the table. The Mars District presented three counterproposals to keep the work in house and demonstrated a willingness on many occasions to negotiate with the union. Here, once District received the bids from subcontractors, it rolled back its offer on wages at the next meeting on June 2 from its previous position of 3% total increases over four years to a 5% *decrease* over four years, thus widening the gap rather than making a serious effort to resolve differences and reach common ground. *Minersville.*

In stark contrast to the employers in *Wilkinsburg* and *Mars* who offered various counterproposals to the unions, District did not make any reasonable effort to resolve its differences with Union *after* it received bids from subcontractors on May 19, 1993. Instead, District unilaterally declared its first impasse on June 15, 1993, after only five total bargaining sessions in six months, of which the one on May 3 was the first where estimates of subcontracting numbers were even presented. This first declaration of impasse occurred on June 15, even before the issue of subcontracting had been seriously discussed, which occurred on July 6. In *Wilkinsburg* and in *Mars,* on the other hand, *both* parties, respectively, had obviously tried to resolve their differences, had exhausted their offers and demands and had no further movement

left to present in the negotiations, thus resulting in impasse. Here, Union was still insisting that it could negotiate further if it were only given a little more time.

Union's two rejected counterproposals on July 12, followed by its declared intention to meet with its membership and to bargain further were strong favorable signals from Union to District that substantial movement might result. The definition of an impasse is not met when District has indicated by its conduct that it is not interested in a proposal forthcoming from its adversary who insists it is not deadlocked and, further, was not met when District subcontracted regardless of whether or not more substantial movement would be forthcoming from Union.

If July 14 had some special significance to Employer, Employer should have disclosed its urgency to Union and insisted on more and frequent meetings before or after June 8 and/or filed an allegation of unfair labor practices which it had a right to do if it believed Union was not bargaining in good faith due to such actions as Noonan's cancellation of the June 8 meeting. Once Union started serious movement on July 12, however, any impasse that may have been argued to exist prior to that time was broken when Union obviously accelerated negotiations with two substantial proposals on July 12, previous to the July 14th deadline, reasserted its previous contention that it was not at impasse and requested more time to obtain further authorization from its membership, especially since the previous membership meeting of July 2 had shown strong evidence of a significant breakthrough in Union's position.

Progress, not impasse, with Union should have been clearly perceptible to an employer bargaining in good faith. We conclude, therefore, that the Board had substantial evidence to find that the parties had not reached an impasse on July 14, when District voted to subcontract bargaining unit services.

Although we disagree with the reasoning of the Board and the trial court that District was guilty of refusing to bargain in good faith primarily because it failed to make a counterproposal as Section 701 of the Act protects that aspect of negotiations, we do agree, under all of the circumstances presented in this case, that the whole of District's actions showed a failure to bargain in good faith, that no impasse existed when subcontracting took place, that there was substantial evidence to support Board's conclusions, and that the Board did not ignore credible evidence of District's good faith or make arbitrary and unreasonable conclusions based on the facts presented.

Accordingly, the order of the Court of Common Pleas of Bucks County is affirmed.

### ORDER

NOW, December 16, 1996, the order of the Court of Common Pleas of Bucks County, No. 94–9512–18–6, dated August 9, 1995, is affirmed.