**UPPER MORELAND TOWNSHIP DISTRICT, Appellant,**

v.

**PENNSYLVANIA LABOR RELATIONS BOARD.**

Commonwealth Court of Pennsylvania.

Argued Feb. 3, 1997.

Decided May 23, 1997.

Reargument Denied July 17, 1997.

Ellis H. Katz, Doylestown, for appellant.

Peter Lassi, Harrisburg, for appellee.

Regina C. Hertzig, Philadelphia, for intervenor, International Brotherhood of Firemen.

Before PELLEGRINI and FLAHERTY, JJ., and JIULIANTE, Senior Judge.

FLAHERTY, Judge.

The Upper Moreland Township School District (District) appeals from the May 22, 1996, order of the Court of Common Pleas of Montgomery County (trial court) which affirmed a final order of the Pennsylvania Labor Relations Board (Board), finding that the District committed unfair labor practices by failing to bargain in good faith over subcontracting of bargaining unit work. We affirm.

The International Brotherhood of Firemen and Oilers, Local 1201 (Union) is a bargaining unit that represents the District's maintenance, grounds, custodial and transportation employees. On February 7, 1994, prior to the commencement of negotiations, the District adopted a motion directing that proposals be sought from private contractors to provide custodial, grounds and maintenance services. By letter dated February 16, 1994, before expiration of the collective bargaining agreement between the District and the Union, the Union requested negotiations for a successor agreement. Attached to that letter was the Union's submission of an initial proposal for a 3–year agreement which included annual wage increases of 5%, 5.25% and 5.5%. By letter dated March 7, 1994, the District advised the Union that it was soliciting bids from outside contractors but would continue to receive proposals from the Union. The parties entered their first bargaining session on March 14, 1994. On April 7, 1994, the Union filed unfair labor practice charges against the District.[1]

At a bargaining session held on April 8, 1994, the District orally presented a counterproposal to the Union's initial proposal, pertaining only to transportation employees. With regard to the custodial, grounds and maintenance employees, the District made no affirmative proposal other than to request that the Union submit a counter-proposal which would match the savings of $102,300 in a proposal solicited from the Marriott Corporation (Marriott), when compared to the in-house services currently provided by the Union's members. The District did not indicate that it would accept, as a settlement, a Union proposal that saved it $102,000. The Union informed the District that Marriott's proposal did not include work currently being performed by its members, principal among them, cleaning the District's pool. The District asked the Union to provide it with a written account of the work currently being performed that was omitted from Marriott's proposal, and informed the Union that it had to compete against Marriott's proposal. The District later informed the Union that Marriott would perform any work not expressly excluded from its proposal.

At the next bargaining session, on April 22, 1994, the District stated that Marriott's proposal would actually result in savings of $297,863.00 and, therefore, the Union needed to make a counterproposal comparable to that amount of savings, which was equivalent to a wage cut of $3 an hour, to make a competitive bid. The District set a June 13, 1994, deadline for its decision about subcontracting. It did not, however, indicate that it would accept the Union's concessions as a settlement if they met the money claimed to be saved by Marriott's proposal.

At the May 25, 1994, bargaining session the Union submitted a counter-proposal which reduced annual wage increases to 2%, 2.5% and 3%, respectively, with no other changes to the collective bargaining agreement. The District did not make a counterproposal, but simply stated that the Union had to compete against Marriott's proposal. Again, the District did not state that it would accept the Union's concessions if they met the savings the District would allegedly receive under Marriott's proposal. The District proposed five additional dates for bargaining sessions. While the Union stated it would take the District's proposal under advisement, no additional bargaining sessions were held and the Union requested factfinding. On June 10, 1994, the Board ordered factfinding. A factfinding hearing was held on June 24, 1994. The Union later accepted the factfinder's recommendations but the District rejected them.

---

1. The charges were: refusal to bargain over subcontracting; failing to provide necessary information; authorizing outside contractors to solicit bargaining unit employees to work for them; and engaging in surface bargaining over subcontract issues.

A hearing on the unfair labor practice charges was held on June 22, 1994. On August 1, 1994, the Union requested that the record be reopened to apprise the Board of additional facts, including the facts relating to July 27, 1994, when the District voted to subcontract its custodial, grounds and maintenance work to Marriott. The District and Marriott entered into a contract in August of 1994. The request to reopen was granted and a second day of hearings was held on August 30, 1994. On December 2, 1994, the hearing examiner issued his proposed decision and order which rejected all of the Union's unfair labor practice charges except the Union's charge that the District engaged in surface bargaining over the subcontract issue because of the District's inflexible position that the Union had to compete against Marriott's proposal while the District would not make a counterproposal to the Union. The hearing examiner concluded that the District failed to bargain in good faith, thus violating Sections 1201(a)(1) and 1201(a)(5) of the Public Employe Relations Act (PERA).[2]

As a remedy, the hearing examiner ordered District to rescind its subcontract with Marriott and offer to unconditionally reinstate the affected employees with back-pay. The District appealed the decision to the Board, which (1) dismissed the District's exceptions to the examiner's proposed decision order and (2) made the decision final on September 12, 1995. The District then appealed to the trial court, which affirmed the final order of the Board. The District now appeals to this Court.

■ On appeal, the District raises the following issues: (1) whether the Board abused its discretion in granting the request by the Union for reopening of the record because of a material change in fact; (2) whether the Board's decision is arbitrary, capricious and constitutes an abuse of discretion because it

relies exclusively upon the Board's decision in *Morrisville School District,* 26 PPER ¶ 26181 (Court of Common Pleas of Bucks County, 1995) (*Morrisville v. PLRB*);[3] (3) whether the Board reasonably concluded that District did not bargain in good faith over subcontracting of bargaining unit work; and (4) whether the Board abused its discretion in directing the usual and customary remedy of restoration of the status quo ante in the case of unlawful subcontracting.[4]

## REOPENING OF THE RECORD

■ The District initially asserts that the Board abused its discretion because of its decision to grant reopening of the record. The general rules of administrative practice and procedure expressly provide for reopening of the record when there are "material changes of fact or law alleged to have occurred since the conclusion of the hearing." 1 Pa.Code § 35.231(a). Additionally, we note that whether to grant or deny a petition to open is a discretionary decision left to the administrative agency. *Al Hamilton Contracting Co. v. Department of Environmental Resources,* 659 A.2d 31 (Pa.Cmwlth.1995). As this is a matter of the Board's discretion, this court will not reverse the decision absent an abuse of that discretion. *Id.* Here, the Board's hearing examiner, in footnote 2 of his proposed decision and order, explained that the request to reopen was granted because:

according to the district, the term of the subcontract had not been an issue at the hearing, thus making the term of the subcontract entered into immaterial. As the district acknowledges, however, the charge was filed before the district entered into a subcontract. Under the circumstances, the very allegation that the district had entered into a subcontract raised a new fact which the board has jurisdiction to

---

2. Act of July 23, 1970, P.L. 563, *as amended,* 43 P.S. §§ 1101.1201(a)(1) and 1101.1201(a)(5).

3. The District's brief in the present matter was filed before the opinion of this court of the same case on appeal was published in *Morrisville School District v. Pennsylvania Labor Relations Board,* 687 A.2d 5 (Pa.Cmwlth.1996) (*Morrisville*).

4. When reviewing a decision of a common pleas court where no testimony is taken by a Board or a court, who merely reviewed the proceedings before the hearing examiner, this court's appellate review is limited to determining whether the findings adopted by and/or made by the Board are supported by substantial evidence and whether conclusions drawn from those facts are reasonable and not capricious, arbitrary or illegal. *Id.*

address as part of its investigation of the charge as filed.

(R.R. at 643a.) Thus, we note no abuse of discretion.

Moreover, contrary to the District's assertion, the Union was not permitted to retry its case on the second day of hearings after the reopening of the record. A review of the record reveals that the hearing officer sustained objections by the District's counsel when Union sought to elicit testimony which was unrelated to the change in facts between the first and second days of the hearing. Moreover, the trial court, in footnote 4 of its opinion, noted that the hearing examiner made only two findings which were principally based on evidence offered at the second day of hearing, and that both of these findings concern the District's entry into the subcontract, which was the material change in facts warranting the reopening of the record.

### ARBITRARY AND CAPRICIOUS / GOOD FAITH BARGAINING

The District argues that the Board's decision is arbitrary and capricious because it followed the Board's prior reasoning in *Morrisville v. PLRB,* which concluded that a refusal to make a counterproposal constituted a *per se* refusal to bargain in good faith. That reasoning was subsequently overruled by this court in *Morrisville,* which affirmed the Board's decision on other grounds while expressly rejecting the concept that the failure to make a counterproposal is a *per se* refusal to bargain in good faith because such action is protected by Section 701 of PERA, 43 P.S. § 1101.701.[5] This court is not bound, however, by a decision of the Board. In *Morrisville* this court, in a matter analogous to the present one, went on to hold that it was not the fact that the school district failed to make a counter-proposal that resulted in a lack of good faith bargaining, but that there

were additional factors that constituted the lack of good faith bargaining.

The District further argues *Morrisville v. PLRB* is distinguishable from the present matter because the parties in *Morrisville v. PLRB* disagreed as to whether an impasse had been reached and, in the present case, the District asserts, mistakenly, that there is no dispute that an impasse had been reached because the Union requested factfinding. The trial court here correctly noted, however, that the Union's request for factfinding does not determine whether an impasse was reached but, rather, that good faith bargaining is the prerequisite to finding an impasse. (R.R. at 717a—718a.)

■ We hold that the Board's conclusions regarding the District's failure to bargain in good faith were reasonable. The District has not attacked any of the Board's findings of fact and, as such, those facts found in the Board's final order are binding on this court. *Elizabeth Forward School District v. Pennsylvania Labor Relations Board,* 154 Pa.Cmwlth. 5, 624 A.2d 215 (1992). Thus, our inquiry is limited to solely determining whether the Board's conclusion, that the District's conduct constituted failure to bargain in good faith, was reasonable based upon the findings of the Board. *Id.*

■ "Good faith" in collective bargaining cases means that the parties must make "a serious effort to resolve differences and reach a common ground." *Appeal of Cumberland Valley School District,* 483 Pa. 134, 142, 394 A.2d 946, 950 (1978) (citation omitted). Good faith is fundamental to the collective bargaining process and requires at a minimum that the parties negotiate with authority and define for their adversary an initial position which, if accepted, will bind the parties to at least a tentative agreement. Although Section 701 of PERA does not require a party to make any agreement or

---

5. Section 701 of PERA expressly provides that: Collective bargaining is the performance of the mutual obligation of the public employer and the representative of the public employes to meet at reasonable times and confer in good faith with respect to wages, hours and other terms and conditions of employment, or the negotiation of an agreement or any question arising thereunder and the execution of a written contract incorporating any agreement reached but such obligation does not compel either party to agree to a proposal or require the making of a concession.

concession, it does require each party to bargain in good faith.

■ The parties must set forth a position upon which the adversary may rely that the acceptance of which would result in a tentative agreement. At a minimum, each party must present an identifiable target for the adversary to shoot at which will result in at least a tentative agreement, if reached.

In the present case, the Union complains that it was confronted with a moving target but, in fact, there was no target at all ever presented by the District. The District never even made an initial offer. There was no target established by the District that could be squarely hit by any Union counter-proposal which the Union could be assured that the District would accept. The furthest the District would go was to initially demand that the Union be competitive with the subcontractor and request a proposal that will save the District $102,300. Before the Union could even get enough information to respond to the District's initial invitation for proposals, the District further indicated that instead of the $102,300 in savings its negotiators wanted savings of $297,863 before they would even ask the Board if it was acceptable.

It is not a fair practice to refuse to define the terms the Employer will accept in a settlement before contracting away the bargaining unit's work. Here the Union never received a single firm proposal for the maintenance, grounds and custodial employees from the Employer initially or at any time prior to contracting out the work. The unfairness of the District's position herein was magnified by the District's further retreat into obscurity when it increased the amount of savings necessary as a precondition to Board consideration of such concessions without giving firm assurances to the Union that even if these savings were met there would be, at least, a tentative agreement.

Indeed, this failure to present a position to the Union which could achieve settlement was specifically acknowledged during the cross-examination of the District's solicitor, who was also its chief negotiator, as follows:

Q. Let me ask it this way: you now say that we told the bargaining unit that in order to keep the work in-house here is the amount of savings you must achieve, and first it was $102,000 and now it is $297,000. Did I get that right?

A. We have used those figures. We have not ever said to the union here is what you have to do to keep it in the house, no.

Q. Are you saying that if the union came up with $102,000 in savings that they still wouldn't be able to keep the work in-house?

A. If the union came up with $102,000 in savings we would present that fact to the school board and the school board would then make a decision. . . .

. . . .

Q. If we come up with $102,000, which it was at one time, or if we come up with $297,000 at another time, that we could keep the work.

A. That proposal was not put to the union because I do not know what the decision of the board would be if the union came up with either of those numbers.

Q. So are you saying that the school district's position on keeping the work in-house was not necessarily based on the amount of savings that would be achieved?

A. What I have said to the union is that in order to have the union have any hope of keeping the work it must show some savings. . . .

(R.R. at 138a—141a.)

■ Further, the District not only failed to move toward a common ground from its initial position, it actually widened the gap in negotiations. The District's solicitor and chief counsel acknowledged during cross-examination that the District was looking for more than just economic savings.

Q. That's the question . . . Can you answer it?

A. My prior testimony and my current testimony is that the district was looking at both economics and quality.

Q. Okay. So, then, it is not only the savings that must be achieved but some kind

of quality thing that we have to come up with?

A. We have said that all along to the union.

Q. In fact, you didn't say that all along....

(R.R. at 142a.) Such weaving and dodging during negotiations by the District cannot be sanctioned because it puts the Union's negotiators in the unconscionable position of demanding that they go before the Union membership with terms for which they cannot vouch will result in at least a tentative agreement if the members ratify. While the Board here erroneously believed that the failure of the District to make a counterproposal was the key factor in determining a violation of good faith bargaining, it did reach the right conclusion. As in *Morrisville,* the facts in this matter do not support the Board's rationale, but they do support the Board's ultimate conclusion that the District failed to bargain in good faith. This court has the power to affirm the decision of an administrative agency, even though the administrative agency applied erroneous rationale in reaching the decision, when the record provides a basis for that decision. *East Allegheny School District v. Secretary of Education,* 145 Pa.Cmwlth. 477, 603 A.2d 713 (1992).

**RESTORATION OF STATUS QUO ANTE**

 Finally, we address the District's argument that the Board abused its discretion by directing it to rescind the subcontract of the bargaining unit work and reinstate the employees of the bargaining unit with back-pay. In cases of unlawful subcontracting, however, a long-standing remedy is to order the subcontract rescinded and the affected employees reinstated to their former positions with back-pay. *Fibreboard Paper Products Corp. v. National Labor Relations Board,* 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). The Pennsylvania Supreme Court has held that restoration of the status quo ante is the type of remedy well within the Board's discretion to utilize in the remedy of an unfair practice. *Cumberland Valley,* 483 Pa. at 146, 394 A.2d at 952. We see

no reason to hold here that the Board abused its discretion.

Therefore, the trial court correctly concluded that the Board did not err in finding that the District committed unfair labor practices and in directing the District to rescind its subcontract with Marriott and reinstate the bargaining unit employees with back-pay.

Accordingly, the order of the trial court is affirmed.

### *ORDER*

NOW, May 23, 1997, the May 22, 1996, order of the Court of Common Pleas of Montgomery County, No. 95–19538, is affirmed.