## Central Dauphin Education Association v. Central Dauphin School District

C.P. of Dauphin County, no. 5764 equity 2001.

*Thomas W. Scott,* for association.
*John P. Krill* and *David R. Fine,* for school district.

CLARK JR., *J.,* March 30, 2001—The underlying cause of this action was the inability of the Central Dauphin Education Association and the Central Dauphin School District to reach a new negotiated collective bargaining agreement regarding the terms and conditions

of employment for the school teachers who make up the association, and who are employed by the school district. The prior agreement covered a four-year period that began on July 1, 1996, and expired on June 30, 2000.

Throughout the past several decades, agreements negotiated between the association and the school district have been guided by the provisions of the Public Employee Relations Act (also commonly referred to as PERA, or Act 195 of 1970), 43 P.S. §1101.101 et seq., and the Public School Code, 24 P.S. §11-1101 et seq. In July of 1992, the Pennsylvania Legislature enacted article XI-A of the Public School Code (commonly referred to as Act 88 of 1992). The Act 88 provisions have, since their passage, been utilized in the collective bargaining negotiations involving teachers and their employing school districts. Act 88 was not, however, intended to completely replace PERA. In fact, the Pennsylvania Legislature stated that PERA "is to be read in pari materia with the addition of article XI-A of the Act, but is repealed insofar as it is clearly inconsistent with the addition of article XI-A of the Act." (Section 6 of Act 1992, July 9, P.L. 403, no. 88).

In anticipation of the expiration of the 1996-2000 agreement on June 30, 2000, and pursuant to these legislative acts, a state mediator appears to have been assigned to assist the parties in their collective bargaining efforts in January 2000. After mediated negotiations failed to produce a new agreement, the dispute was presented to a fact-finder in August 2000. The fact-finder issued a report in September 2000, but its terms were deemed unacceptable by both the association and the school district.

Mediated negotiations continued through the end of January 2001, but a new negotiated agreement was not obtained. Throughout these negotiations, and following the expiration of the 1996-2000 agreement on June 30, 2000, the members of the association continued to work under the terms of that expired agreement. The association commenced a lawful strike on February 1, 2001, which continued through February 21, 2001. The students of the Central Dauphin School District did not attend classes during this time period, inasmuch as the school district cancelled classes during the strike.

As a result of the failed negotiations, and due to the statutes which require that students be provided with 180 days of schooling by June 30[1] within a school calendar year, the board of school directors of the school district met on February 5, 2001, and adopted a resolution which purported to unilaterally impose upon the members of the association the terms and conditions of a new labor contract (imposed agreement).[2] On February 16, 2001,

---

1. In this court's memorandum and order of February 21, 2001, this date was listed as June 15, which would be the appropriate date if both of the parties to a collective bargaining agreement agreed to submit to final best-offer arbitration. (See 24 P.S. §11-1125-A.) The 180 days of instruction required by 24 P.S. §15-1501 must be completed, regardless of the circumstances, no later than June 30 under the provisions of Act 88. Should this deadline become threatened, the secretary of education is authorized to initiate injunctive proceedings in the appropriate county court of common pleas. 24 P.S. §11-1161-A.

2. As a general matter, some of the altered terms and conditions of employment included: (1) reductions in the health insurance plans made available to the association members; (2) increases in the cost of health insurance coverage, including co-payments to be made by the teachers; (3) elimination of unpaid leaves of absence, (4) restrictions on professional development, and (5) wage adjustments that would hinder

the association filed a complaint in equity and a petition for preliminary injunction which requested that this court enjoin the school district from implementing the terms and conditions of the imposed agreement. Following a hearing on the matters before this court on February 21, 2001, an order was entered which stated:

"(1) That the association members shall return to work on Thursday, February 22, 2001;

"(2) The school district shall provide work to the association members under the same terms and conditions as provided under the collective bargaining agreement which expired on June 30, 2000;

"(3) That the association is hereby ordered to post a bond in the amount of $5,000 before 12 p.m. on February 22, 2001, naming the Commonwealth as the obligee and conditioned according to the provisions of Pa.R.C.P., Rule 1531(b)(1).

"(4) Matters concerning any possible unfair practices by the school district are hereby transferred directly to the Pennsylvania Labor Relations Board pursuant to the Pennsylvania Rules of Civil Procedure, for further action and final determination as that board deems appropriate.

"(5) The prothonotary shall certify a photocopy of the docket entries of the above matter and the record to the secretary of the Pennsylvania Labor Relations Board, and upon receipt of said documents, the secretary of the Penn-

---

the progress of the teachers on the salary scale. See petitioners' complaint in equity, February 16, 2001, ¶41, and respondents' brief in opposition to petition for preliminary injunction, February 21, 2001, pp. 4-6.

sylvania Labor Relations Board shall consider them to be the equivalent of a regularly filed unfair practices complaint.

"The filing of any appeal of this order shall not act as an automatic stay or supersedeas pursuant to Pa.R.A.P., Rule 1736, without an order from a court of superior jurisdiction." Order of the Court of Common Pleas, Dauphin County, Pennsylvania, February 21, 2001.

The school district filed an appeal with the Commonwealth Court of Pennsylvania on February 22, 2001. This court directed the school district to file a statement of matters complained of on appeal, pursuant to Pa.R.A.P. 1925(b), on February 27, 2001. The school district's statement of matters complained of raised the following issues:

"(1) The court lacked subject matter jurisdiction.

"(2) Petitioners failed to establish the factors requisite for an injunction.

"(3) There is no reasonable basis for the court's order.

"(4) The court's finding that a 'lockout' had occurred is contrary to the definition of 'lockout' in the Public School Code and is in error.

"(5) Petitioners came before the court with 'unclean hands,' in that they were threatening defiance of the statutory deadline for ending their strike and the immediacy of harm was created by them.

"(6) The Pennsylvania Labor Relations Board had exclusive jurisdiction over the matters complained of.

"(7) Petitioners had an adequate remedy at law in that they could have pursued their complaint before the Pennsylvania Labor Relations Board.

"(8) Petitioners lacked standing to seek the relief they obtained.

"(9) There was no irreparable harm to petitioners.

"(10) Petitioners had no clear right to relief.

"(11) Transfer of the complaint to the Pennsylvania Labor Relations Board was improper when petitioners did not request such a transfer and when petitioners expressly objected to the jurisdiction of the Pennsylvania Labor Relations Board.

"(12) The court lacked authority to issue its order under Pa.R.A.P. 1925, because it had already issued an opinion.

"(13) The provision of the order protecting itself from automatic supersedeas was in error and ineffective." Respondents' statement of matters complained of on appeal, March 14, 2001.

The association filed a brief in reply to respondents' statement of matters complained of on appeal on March 21, 2001, and also filed a supplemental brief in reply to respondents' statement of matters complained of on appeal on March 23, 2001.[3]

## OVERVIEW OF ACT 88

In order to more fully understand the position of the parties at the time the injunction was issued, the court will briefly discuss the procedures outlined in 24 P.S. §11-1101-A et seq.

---

3. The supplemental brief filed by the association touched on an issue that was not raised by the school district in its appeal. Therefore, this court will not address that issue herein.

24 P.S. §11-1121-A allows the parties to voluntarily submit to mediation at any time. However, this section also *requires* the parties to submit to mediation if a dispute still exists 126 days prior to the June 30 deadline. The negotiations between the school district and the association failed to produce a new contract and, indeed, a state mediator was assigned on January 13, 2001. Further negotiations and mediation have also failed to produce an agreement, but mediation continues pursuant to 24 P.S. §11-1122-A(a)(1).

After the mediated negotiations failed to produce a contract, the parties agreed to fact-finding as provided by 24 P.S. §11-1122-A, and the Pennsylvania Labor Relations Board appointed a fact-finder. The fact-finder issued a report on September 22, 2000, which was rejected by the parties. Negotiations continued without success, and the association notified the school district of its intention to commence a lawful strike,[4] as defined in 24 P.S. §11-1101-A, on January 29, 2001. The strike began on February 1, 2001, and continued through February 21, 2001. During the strike, on February 5, 2001, the directors met and unilaterally implemented a resolution.

A critical component of this matter is that the school district's unilateral implementation took place prior to the utilization of arbitration procedures outlined in Act

---

4. This "strike" is not of the usual unlimited variety of labor job action, but, rather is a very narrowly drawn and precisely limited cessation of work which is statutorily permitted to occur during the midst of the statutorily permitted process set forth in Act 88, and is specifically limited in length. After any such limited initial strike periods the employees are required to return to work and the remainder of the Act 88 processes then are implemented, including mandatory arbitration.

88. 24 P.S. §11-1123-A provides a form of negotiated final best-offer arbitration where the parties bargain upon the adoption of one of three enumerated impasse procedures. The adoption of an impasse procedure, however, would not require either party to agree to a proposal or make a concession.

24 P.S. §11-1125-A(a) provides for final best-offer arbitration if both parties agree to submit to such. If a strike or lockout threatens the 180 day school year, however, the parties must submit to mandated final best-offer arbitration. 24 P.S. §11-1125-A(b).

Although Act 88 clearly provides arbitration procedures for the parties to utilize, these procedures were not yet employed prior to the school district's imposition of terms and conditions of employment, vis-à-vis, the imposed agreement.

## JURISDICTION

The school board first argues that this court lacks subject matter jurisdiction, because it believes the petitioners have submitted a complaint that qualifies more as an unfair labor practice charge, rather than as a suit in equity. In that sense, the school board argues that the Pennsylvania Labor Relations Board has exclusive jurisdiction. See brief in opposition to petition for preliminary injunction, February 21, 2001, p. 7, (citing *Hotel & Restaurant Employees International Union Local No. 391-AFL-CIO v. School District Allentown City,* 702 A.2d 16, 18 (Pa. Commw. 1997)). This court finds, however, pursuant to the extensive line of cases decided under *Mazzie v. Commonwealth,* 495 Pa. 128, 432 A.2d 985

(1981), that we were completely within our powers to issue a preliminary injunction in order to maintain the status quo.

In the *Mazzie* case, the Pennsylvania Supreme Court ultimately upheld a preliminary injunction and affirmed the order of the Commonwealth Court. The union representing the employees filed grievances with the Bureau of Labor Relations in the governor's office on October 28 and November 3, 1980, after the majority of its members were asked to submit statements of financial interest by November 3, 1980, pursuant to an executive order issued by Governor Thornburgh. The union believed the executive order unilaterally altered the provisions of employment. The union also filed an unfair labor practice charge with the Pennsylvania Labor Relations Board on November 3, 1980. In the meantime, the union also commenced an action in the Commonwealth Court of Pennsylvania on October 31, 1980 seeking an injunction against enforcement of the executive order. *Id.* at 132, 432 A.2d at 987.

The Commonwealth Court entered a temporary restraining order on October 31, 1980, and continued the order following a hearing on the union's motion for a preliminary injunction on November 6, 1980. On appeal, the Commonwealth argued that the appellees (union) did not show a clear and immediate right to relief, nor did the appellees show that greater injury would result if the injunction were not granted. The Commonwealth also argued, just as the school district argues in the instant case, that if the statements of financial interest were indeed matters of collective bargaining, then the Pennsyl-

vania Labor Relations Board had "exclusive jurisdiction to consider the charge of unfair labor practice and the courts may not intervene to preserve the status quo pending exhaustion of administrative remedies." *Id.* at 133, 432 A.2d at 987-88.

In affirming the Commonwealth Court's issuance of a preliminary injunction in *Mazzie,* the Supreme Court of Pennsylvania stated:

"The Commonwealth correctly states that our case law supports the PLRB's exclusive jurisdiction to determine *whether* an unfair labor practice has occurred. *Hollinger v. Department of Public Welfare,* 469 Pa. 358, 365 A.2d 1245 (1976). We have, however, never held that the PLRB has exclusive jurisdiction to seek a status quo injunction pending final determination by it as to whether an unfair labor practice has occurred." *Id.* at 140, 432 A.2d at 991. (emphasis in original)[5]

_____

5. The Supreme Court of Pennsylvania also noted that "preliminary injunctions are preventive in nature and are designed to maintain the status quo until the rights of the parties are finally determined. There is, however, a distinction between mandatory injunctions, which command the performance of some positive act to preserve the status quo, and prohibitory injunctions, which enjoin the doing of an act that will change the status quo. This court has engaged in greater scrutiny of mandatory injunctions and has often stated that they should be issued more sparingly than injunctions that are merely prohibitory." *Mazzie v. Commonwealth,* 495 Pa. 128, 134, 432 A.2d 985, 988 (1981). There is no doubt that the preliminary injunction issued by this court on February 21, 2001 was a prohibitory injunction, inasmuch as it was issued to prohibit the school district from unilaterally implementing terms and conditions of employment in order to maintain the status quo.

The approach taken by this court in the instant case follows that holding. This court did not make any final determinations regarding the merits of any possible unfair labor practices, but merely transferred the dispute to the Pennsylvania Labor Relations Board to ultimately decide those issues. An injunction was issued to maintain the status quo until those issues were determined.

This court relied on the principles of Pa.R.C.P. no. 213(f)[6] and, more specifically, the holding of the Commonwealth Court of Pennsylvania in *Smith v. Borough of Castle Shannon,* 163 Pa. Commw. 531, 641 A.2d 671 (1994), in transferring jurisdiction directly to the Pennsylvania Labor Relations Board. In that case, after grievances were submitted to binding arbitration pursuant to the collective bargaining agreement that existed between the police officers and the Borough of Castle Shannon, the arbitrator ruled in favor of the police officers. When the borough failed to comply with the arbitration awards, the police officers filed a complaint in mandamus with the court of common pleas. *Id.* at 533-34, 641 A.2d at 672.

The borough argued that mandamus was not a proper remedy, and the court of common pleas sustained the

---

6. Pa.R.C.P. no. 213(f) states:

"(f) When an action is commenced in a court which has no jurisdiction over the subject matter of the action it shall not be dismissed if there is another court of appropriate jurisdiction within the Commonwealth in which the action could originally have been brought but the court shall transfer the action at the cost of the plaintiff to the court of appropriate jurisdiction. It shall be the duty of the prothonotary or clerk of the court in which the action is commenced to transfer the record together with a certified copy of the docket entries to the prothonotary or clerk of the court to which the action is transferred."

preliminary objections. *Id.* at 534-35, 641 A.2d at 673. On appeal, the Commonwealth Court vacated the decision of the court of common pleas, transferred the matter to the Pennsylvania Labor Relations Board, and stated, "the PLRB has jurisdiction to determine whether the borough's alleged failure to comply with the arbitration award is an unfair labor practice." *Id.* at 537, 641 A.2d at 674. See also, *Borough of Nazareth v. Pennsylvania Labor Relations Board,* 534 Pa. 11, 626 A.2d 493 (1993), and *Pottstown Police Officers' Association v. Pennsylvania Labor Relations Board,* 160 Pa. Commw. 87, 634 A.2d 711 (1993). Likewise, in the instant matter, this court finds that a direct transfer to the Pennsylvania Labor Relations Board is appropriate for consideration of any possible unfair labor practices.

## PRELIMINARY INJUNCTION

The principles surrounding the issuance of a preliminary injunction are well established. In order to succeed, the petitioners have the burden of showing:

"(1) [T]hat relief is necessary to prevent immediate and irreparable harm which cannot be compensated by damages; (2) that greater injury will occur from refusing the injunction than from granting it; (3) that the injunction will restore the parties to the status quo as it existed immediately before the alleged wrongful conduct; (4) that the alleged wrong is manifest, and the injunction is reasonably suited to abate it; and (5) that the plaintiff's right to relief is clear." *Lewis v. City of Harrisburg,* 158 Pa. Commw. 318, 324, 631 A.2d 807, 810 (1993).

Another source provides:

"In the field of labor relations, injunction is an extraordinary remedy, and the tests applicable to other cases are to be applied. While the issuance of an injunction may be mandatory in exceptional cases, the granting of the remedy ordinarily rests in the discretion of the court, and the court will not entertain an action for injunctive relief where there is an adequate remedy at law. The interference of the court in labor disputes directed either against employer or employees should be exercised sparingly and with caution, especially where fundamental rights of union and employer are involved. So it has been held that in controversies between employers and employees, as in other cases, injunctions are granted only in cases of urgent necessity, to guard against injuries not merely feared but reasonably to be apprehended, and likely to be irreparable.

"An injunction does not issue as punishment for the past; its only legitimate end is protection for the future. The basis of permissible action by the court in labor disputes is the probability of threatened and unjustified interference with the rights of plaintiff. The right to an injunction is to be determined as of the time of the hearing, and an injunction is granted with reference to what there is reason to expect in its absence." 51B C.J.S. Labor Relations §781.

It is readily apparent that injunctive relief was necessary to prevent immediate and irreparable harm which could not be compensated for by damages. The school district unilaterally implemented terms and conditions of employment at a time when the association was con-

ducting a limited lawful strike. Furthermore, these changes preceded the utilization of the arbitration procedures outlined in Act 88.

At a minimum, the actions of unilateral implementation exercised by the school district leave the association in a frustrated negotiating position. Allowing the school district to act in such a way would immediately and irreparably eliminate any leverage that the association could maintain throughout the bargaining process. In short, if this avenue of conduct is available to the school district at this stage of the negotiation process, then any impression of economic leverage in favor of the association at any stage of negotiations is purely illusory.[7]

Keeping this in mind, the school district had to know its actions would provoke an immediate response from the association and create great discord in future bargaining.

If the school district could unilaterally dictate the wages and conditions of employment to the teachers in the first instance, and could thereafter (at any time, and as many times) change, reduce or eliminate wages, benefits or working conditions, what teachers' union would dare to advance any form of a proposition in collective bargaining that might somehow not be well received by their employer? This would, most likely, only lead to further unilateral changes to the detriment of the union.

---

7. This position taken by the court, or any other position within this opinion, is not intended to infer that the school district has, in fact, committed an unfair labor practice. This determination, as discussed previously, is within the exclusive jurisdiction of the PLRB.

Furthermore, this court stated "that the school district, by unilaterally implementing the terms and conditions of employment (imposed agreement) which the association members are apparently expected to accept, has created a constructive, or de facto, lockout." Memorandum and order, February 21, 2001, pp. 3-4. Act 88 defines lockout as "the cessation of furnishing of work to employees or withholding work from employees for the purpose of inducing, influencing or coercing a change in the conditions or compensation or the rights, privileges or obligations of employment." 24 P.S. §11-1101-A. The school district argues that a lockout could not have existed because it never refused to furnish work to the teachers. Under this rationale, however, any school district could avoid a potential lockout by merely allowing classes to continue while implementing its own terms and conditions of employment. In this sense, a school district could, in effect, coerce a change of conditions in employment.[8] Therefore, this court concludes, although the school district did not refuse to provide work to the association, it created a de facto lockout by withholding work from the teachers under the terms of the expired collective bargaining agreement, while attempting to

_____

8. See *Pennsylvania Labor Relations Board v. Williamsport Area School District,* 486 Pa. 375, 381, 406 A.2d 329, 332 (1979). In that case, the Supreme Court of Pennsylvania, relying on *Appeal of Cumberland Valley School District,* 483 Pa. 134, 143, 394 A.2d 946, 951 (1978), stated that "[t]he coercive effect of the unilateral [changes] is obvious. The bargaining authority of the [association] to freely bargain is seriously undermined."

coerce the teachers to work under the terms of the imposed agreement.[9]

The second thing that must be shown prior to issuing an injunction is that greater injury will result from refusing the injunction rather than from granting it. The discussion to this point has clearly shown that the abilities of the association to bargain effectively would be seriously hindered, if not crippled, were this court not to issue an injunction.

The third necessity is that the injunction restores the parties to the status quo as it existed prior to the alleged wrongful conduct. The preliminary injunction issued by this court on February 21, 2001 made it clear that the association members were to return to work on February 22, 2001 under the terms and conditions of the collective bargaining agreement that expired on June 30, 2000.

Next, the alleged wrong must be manifest, and the injunction must be reasonably suited to abate it. It is evident that the alleged wrong is the school district's unilateral implementation of terms and conditions of employment. As stated immediately above, this court issued a preliminary injunction which prevented such unilateral implementation, and returned the parties to the status quo.

---

9. 24 P.S. §11-1132-A(2) provides that lockouts are prohibited during final best-offer arbitration. As discussed above, Act 88 provides for final best-offer arbitration. The Pennsylvania Supreme Court has held that the violation of a statute constitutes immediate and irreparable harm, and the issuance of a preliminary injunction to avoid such a violation is justified. *Public Utility Commission v. Israel,* 356 Pa. 400, 406, 52 A.2d 317, 321 (1947). Inasmuch as this court held that a de facto lockout existed, the preliminary injunction was justified to avoid any possible violation of 24 P.S. §11-1132-A(2).

Finally, this court finds that the rights of the plaintiffs are clear, inasmuch as the school district unilaterally implemented terms and conditions of employment when dispute resolution processes remained under Act 88. The school district argues that the bargaining process reached an impasse, thus allowing it to unilaterally implement the contract provisions while the association was on strike. Impasse is defined by Act 88 as "the failure of an employer and an employee organization to reach an agreement in the course of negotiations." 24 P.S. §11-1101-A. However, the Commonwealth Court of Pennsylvania stated that the term impasse, when used in public sector law under PERA, "can also mean the end of the statutory dispute resolution process, as well as deadlock." *Philadelphia Housing Authority v. Pennsylvania Labor Relations Board,* 153 Pa. Commw. 20, 24, 620 A.2d 594, 596 (1993). The statutory dispute resolution processes provided for in Act 88 were not exhausted prior to the school district's unilateral implementation of the contract provisions. From this perspective, the plaintiffs had a clear right to obtain a status quo injunction.

This court understands the "either-or" argument presented by the school district. However, although it is clear that impasse may be interpreted to mean either deadlock, or the end of the statutory dispute resolution process, it is important to keep the nature of the dispute in mind.

As noted above, the students are required to receive 180 days of education in a calendar school year. In order to assure that the students of this Commonwealth would be provided with the required 180 days of instruction during a work stoppage by an employee organization,

the General Assembly amended the Public School Code by adding provisions regarding collective bargaining. *Carroll v. Ringgold Education Association,* 168 Pa. Commw. 681, 652 A.2d 417 (1994). Furthermore, the sole purpose of the requirement that schools provide 180 days of instruction per calendar year is to benefit the students of the Commonwealth rather than the teachers. *Id.* at 687, 652 A.2d at 419.

For the school district to assume that it was capable of unilaterally implementing terms and conditions of employment every time contract talks stalled would be contrary to the basic principles of collective bargaining, and would render the dispute resolution processes developed by the legislature moot. Absent a clear, unequivocal statement in the law by our General Assembly that it was their intention to empower the school district in this fashion, and thereby literally destroy collective bargaining in the school districts throughout this Commonwealth, we are not prepared to ascribe that intention through judicial fiat. If we were to succumb to that enticement, we would effectively flush away over three decades of accumulated labor law in this Commonwealth.

Furthermore, if the school district were simply entitled to unilaterally implement contract provisions when a lawful strike is resorted to, what purpose would a strike serve? The union representing the association, in effect, would become useless, and the school district would have no incentive to settle the dispute. This scenario provides no incentive for the school district to bargain, as it would have the capability of prolonging a dispute, all the while paying the association members at levels that would be below market value.

In *Philadelphia Housing Authority v. Pennsylvania Labor Relations Board,* 153 Pa. Commw. 20, 620 A.2d 594 (1993), the main issue facing the Commonwealth Court of Pennsylvania was whether an employer could unilaterally implement terms and conditions of employment under PERA, where a statutory impasse was reached, but the employees had not interrupted public services by striking. In holding that the employer could not take unilateral action at such a time, the Commonwealth Court was concerned with the effects this behavior would have on the negotiation process. That court stated that "[u]nilateral action by an employer during a period of no contract while employees continue to work serves to polarize the process and would encourage strikes by employees who otherwise may wish to continue working under the terms of the expired agreement while negotiations continue." *Id.* at 32, 620 A.2d at 600.

Granted, the facts surrounding the instant case are significantly different. First, legislatively speaking, Act 88 must now be considered regarding the collective bargaining process. Second, in the instant scenario, the association was on strike when the school district unilaterally imposed the terms and conditions of employment.

In support of its reasoning in *Philadelphia Housing Authority, supra,* the Commonwealth Court said:

"We believe that a public employer is less likely to negotiate in good faith with a sincere desire to reach mutual agreement if it knows that it may implement its final offer after only 21 days of negotiation and 20 days of mediation. . . . Good faith negotiation would be seriously jeopardized by permitting the employer to imple-

ment its bargaining position after a few face-to-face bargaining sessions and the requisite number of mediation sessions with the mediator. The employer's unilateral achievement of its bargaining position effectively relieves pressure on it to arrive at a mutually agreed resolution of the bargaining impasse. It is the tension created by the need to find common ground between the parties which is at the core of the process. Relieving that tension greatly removes the incentive of a party to bargain with a sincere desire to reach agreement." *Id.* at 32-33, 620 A.2d at 600.

It seems clear that the Commonwealth Court was concerned with the exhaustion of procedures under PERA, and because the employees chose to continue working under the terms of the expired agreement, the court felt that unilateral action by the employer at that time would have been improper. Likewise, this court must consider whether all of the collective bargaining procedures under Act 88 have been exhausted. As noted above, statutory arbitration processes remain, and allowing unilateral action by the school district at this time would, much like in *Philadelphia Housing Authority,* provide the employer with less desire to reach a mutual agreement.

This court is unwilling to overlook the intentions of the Pennsylvania General Assembly in its enactment of Act 88. Moreover, this court will not condone actions by a party that refuses to recognize the provisions of Act 88. We refuse to believe that the General Assembly intended to give an employer the ability to unilaterally implement terms and conditions of employment when the employees enter into a very limited strike that has

been declared lawful by the very same General Assembly. It would likewise be contrary to logic to believe that the General Assembly included arbitration procedures within Act 88 without the intention that parties utilize those procedures prior to any consideration of unilateral implementation.

Despite this court's inability to ultimately determine whether unfair labor practices have occurred, this court believes it is appropriate to discuss the likelihood that such practices may be found in order to further justify the issuance of the preliminary injunction. This court, therefore, will discuss some other cases that present similar circumstances.

For instance, in *Morrisville School District v. Pennsylvania Labor Relations Board,* 687 A.2d 5 (Pa. Commw. 1996), the Commonwealth Court affirmed the order of the Court of Common Pleas of Bucks County, which had affirmed the decision of the PLRB that there was a failure to bargain in good faith on the part of the employer. In that case, the Commonwealth Court found that the employer refused to continue bargaining although the union continued to negotiate. *Id.* at 9. The Commonwealth Court noted that the "employer has the obligation to bargain in good faith to a bona fide impasse . . . ." *Id.* at 8. Rather than follow this obligation, however, the employer chose to unilaterally declare that an impasse existed, despite the union's willingness to hold more bargaining sessions.

Likewise, it is difficult for this court to conclude that the parties reached an impasse in the instant case. The parties did not utilize arbitration procedures set forth in

Act 88, yet the school district unilaterally determined that an impasse or deadlock existed which allowed it to impose terms and conditions on the association after it commenced a lawful strike.

In *Upper Moreland Township District v. Pennsylvania Labor Relations Board,* 695 A.2d 904 (Pa. Commw. 1997), the Commonwealth Court again affirmed the order issued by the Court of Common Pleas of Montgomery County, which affirmed the PLRB's order that determined the employer failed to bargain in good faith. In discussing the employer's failure to bargain in good faith, the Commonwealth Court stated:

"The parties must set forth a position upon which the adversary may rely that the acceptance of which would result in a tentative agreement. At a minimum, each party must present an identifiable target for the adversary to shoot at which will result in at least a tentative agreement, if reached." *Id.* at 909.

In that regard, the school district never presented the association with an identifiable target prior to the school district's implementation of the imposed agreement. Much like the employer's actions in *Upper Moreland,* the school district's unilateral implementation only widened the gap in the negotiations with the association.[10]

---

10. In *Upper Moreland,* the employer eventually subcontracted away the union's work. During the negotiations, the employer first notified the union that it would have to compete with a subcontractor's bid that would save the employer in excess of $100,000. The employer later notified the union that this figure increased to nearly $300,000, without indicating to the union that the employer would accept such a proposal if the union could match it. The Commonwealth Court stated that "[i]t is not a fair practice to refuse to define the terms the em-

Although the determination of any unfair labor practice will be made by the PLRB, these cases provide this court with an intricate look into the review process exercised by the Commonwealth Court. In that sense, the prior decisions of the Commonwealth Court allow this court to anticipate the validity of any unfair labor practice claims. This, in turn, provides lower courts with more justification for issuing status quo injunctions in cases where similar actions have been adjudicated as unfair labor practices, inasmuch as it helps the lower courts determine whether the petitioner for a preliminary injunction has a clear right to such relief.

## OTHER ARGUMENTS

The school district also argues that the association came before this court with "unclean hands" because the association considered continuing the work stoppage if the teachers were forced to work under the terms of the imposed agreement. This court finds that argument unpersuasive.

It must be noted that this was simply a consideration made by the association, and the preliminary injunction issued by this court eliminated the need on behalf of the association to take such action. Such speculation does not justify a conclusion that the association came before this court with "unclean hands."

The school district questions the standing of the association in this action. The Commonwealth Court of Penn-

---

ployer will accept in a settlement before contracting away the bargaining unit's work." *Upper Moreland Township District v. Pennsylvania Labor Relations Board,* 695 A.2d 904, 909 (Pa. Commw. 1997).

sylvania, in *Harrisburg School District v. Hickok,* 762 A.2d 398, 404 (Pa. Commw. 2000) (citing *Defazio v. Civil Service Commission of Allegheny County,* 526 Pa. 431, 756 A.2d 1103 (2000)), stated:

"The test for standing is that 'one who seeks to challenge governmental action must show a direct and substantial interest [and] a sufficiently close causal connection between the challenged action and the asserted injury to qualify the interest as "immediate" rather than remote.' *Allegheny County v. Monzo,* 509 Pa. 26, [33-35,] 500 A.2d 1096, 1100 (1995) (citing *William Penn Parking Garage Inc. v. City of Pittsburgh,* 464 Pa. 168, 346 A.2d 269 (1975)). We further explained that a substantial interest requires 'some discernible adverse effect to some interest other than the abstract interest of all citizens in having others comply with the law . . . . [D]irect simply means that the person claiming to be aggrieved must show causation of the harm to his interest by [the government's actions].' *Monzo* at [34, 500 A.2d at] 1100. The immediacy or remoteness of the injury is determined by the 'nature of the causal connection between the action complained of and the injury to the person challenging it.' " *Id.*

Although, as stated above, the requirement that students receive 180 days of education is intended to benefit the students, the provisions of Act 88 cannot be ignored in relation to the various school districts and unions representing the teachers. Those provisions deal specifically with the collective bargaining between the school districts and the unions. Inasmuch as some of those provisions address strikes and lockouts, it is difficult to conclude that unions and school districts lack standing to

challenge actions taken by one of the parties. We have already described how the unilateral implementation of terms and conditions would have adversely affected the bargaining position of the association. Furthermore, there can be no argument that the association members would have been directly affected by the changes within the imposed agreement, and the injuries suffered by the association would have been immediate, in that the teachers would have been forced to work under the new terms and conditions when they returned to work on February 22, 2001.

The school district also claims that this court lacked the authority to issue its order of February 27, 2001, which ordered the school district to file a statement of matters complained of on appeal pursuant to Pa.R.A.P. 1925, stating this court already issued an opinion via its memorandum and order of February 21, 2001.

We first note that several issues were raised during the hearing before this court on February 21, 2001, some of which were not contemplated by the parties prior to the hearing. This court is also aware of the statewide implications this case could have on the conduct of employer/teacher collective bargaining. Keeping these considerations in mind, along with the time constraints that were placed on the parties and the court, the issuance of the order directing the school district to file a statement of matters complained of on appeal merely afforded an opportunity to crystallize the issues that would be considered on appeal before the Commonwealth Court.

The last issue raised by the school district is that this court erred when it stated in the February 21, 2001 memo-

randum and order that an appeal would not act as an automatic stay or supersedeas pursuant to Pa.R.A.P. 1736. This court believes it has the authority to modify the terms of any supersedeas under the language of Pa.R.A.P. 1732(a). This court was well aware that an appeal from the issuance of a preliminary injunction was a certainty. Armed with this knowledge, this court was forced to vacate the automatic supersedeas provided for in Pa.R.A.P. 1736(b). Otherwise, the filing of the appeal by the school district would have operated as an automatic stay of this court's February 21, 2001 order, and the issuance of the preliminary injunction would have become moot.

In light of the case law and statutes reviewed, this court finds that its exercise of jurisdiction was proper. Therefore, having found that all of the prerequisites to the issuance of a preliminary injunction have been satisfied, such issuance on February 21, 2001, enjoining the school district from unilaterally implementing the imposed agreement, was justified. This court also finds that it was within its authority to transfer this matter to the PLRB for a determination of whether any unfair labor practices occurred.